Jerry L. LYONS, individually and on behalf of all other persons similarly situated, Plaintiff-Appellant,

v.

GEORGIA PACIFIC CORPORATION SALARIED EMPLOYEES RETIREMENT PLAN, Georgia Pacific Corporation, Defendants-Appellees.

No. 99-10640.

United States Court of Appeals,

Eleventh Circuit.

Aug. 11, 2000.

Appeal from the United States District Court for the Northern District of Georgia.(No. 97-00980-1-CV-JOF), J. Owen Forrester, Judge.

Before CARNES, BARKETT and WILSON, Circuit Judges.

CARNES, Circuit Judge:

This is an Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et. seq.,* case in which we are called upon to decide issues about how to calculate a consensual, lump sum payout in a front-loaded, defined benefit, cash balance pension plan with fixed interest credits. The principal issue is whether such a payout must be calculated using the present value methodology set out in Treasury Regulations 1.411(a)-11 and 1.417(e)-1,[1] the former of which the district court held to be invalid. *See Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan,* 66 F.Supp.2d 1328, 1336 (N.D.Ga.1999). For reasons we will explain, we are convinced that those Treasury regulations are valid and control the calculation of consensual lump sum payouts, at least insofar as they apply to distributions that occurred prior to the effective date of the amendments that the Retirement Protection Act of 1994 made to ERISA § 203(e), 29 U.S.C. § 1053(e).

## I. BACKGROUND

*A. The Plan*

---

[1] Treasury Regulations 1.411(a)-1 and 1.417(e) were promulgated in 1988 and were later amended in 1994. All of our references to these regulations refer to the 1988 versions.

There are two basic types of pension plans, defined contribution plans and defined benefit plans. A defined contribution plan provides for each participant a separate account to which contributions are made, with the retirement benefit depending on the amounts that have been contributed to the account and the investment gains and losses on the amounts in the account. *See* ERISA § 3(34), 29 U.S.C. § 1002(34); *see also* Barbara J. Coleman, *Primer on Employee Retirement Income Security Act* 32-33 (4th ed.1993). No specific, defined retirement amount is promised under a defined contribution plan. *See id.* The plan involved in this case is not of that type.

Instead, this case involves a defined benefit plan, which is one where the retirement benefit is expressed as a certain annual amount to be paid by the employer over the employee's lifetime, beginning at the employee's retirement. *See* ERISA § 3(35), 29 U.S.C. § 1002(35). Such a plan promises a specific defined benefit the calculation of which is not dependent upon investment gains or losses. *See* Coleman, *supra,* at 32-33. There are subtypes of defined benefit plans. The one involved in this case is a cash balance defined benefit plan.

At all times relevant to this case, the Georgia-Pacific Corporation Salaried Employees Retirement Plan ("the Plan") has been a cash balance plan, which is a defined benefit plan that determines benefits for each employee by reference to the amount of the employee's hypothetical account balance. An employee's hypothetical account balance is credited by the employer with hypothetical allocations and hypothetical interest earnings determined under a formula set forth in the Plan. The hypothetical allocations and hypothetical earnings are designed to resemble actual contributions and earnings under a defined contribution plan. *See* I.R.S. Notice 96-8, 1996-1 C.B. 359. One benefit of cash balance plans is that they "allow younger workers to take a larger benefit with them when changing jobs." *Give Employees Meaningful Information When Pensions are Changed to Cash Balance Plans, Says Actuary,* PR Newswire, May 7, 1999.[2]

---

[2]The first cash balance plan was introduced in 1985 for BankAmerica Corporation. *See* Lindsay Wyatt, *"Hybrid" Plans Fit Evolving Workforce,* Pension Management, March, 1996; *see also* Richard D. Brown, *An Introduction to Basic Employee Retirement Benefits,* 340 P.L.I. 7, 82 (1993) ("The Cash Balance Plan is a modified form of defined benefit pension plan which was introduced by the actuarial firm of Kwasha Lipton in the mid-1980's."). Since then, many large companies such as BellSouth Corp.,

Section 3.1 of the Plan requires that a hypothetical bookkeeping account—the Personal Account—be established and maintained for each participant. Each month the participant's Personal Account is credited with (1) *service credits,* a specified percentage of the participant's compensation for that month; and (2) *interest credits,* which are derived by multiplying the hypothetical balance in the Personal Account by the Periodic Adjustment Percentage. That adjustment percentage is computed under the Plan by determining the Pension Benefit Guaranty Corporation ("PBGC")[3] twelve-month "immediate" annuity interest rate for the preceding year, then adding .75% to that rate, and, lastly, dividing this composite annual rate by 12. Under ERISA the Plan could have used an adjustment percentage equal to the prescribed maximum PBGC rate, but instead it used a higher rate. If the Plan had not used a higher adjustment rate, the dispute in this case would never have arisen, but more about that later.

Although service credits cease when the participant leaves employment, interest credits continue until the participant's Benefit Commencement Date. That is why the Plan is said to be a "front-loaded" interest credit plan, defined as one in which "future interest credits to an employee's hypothetical account balance are not conditioned upon future service." I.R.S. Notice 96-8 at 4. In the case of an annuity form of benefit under this Plan, the Benefit Commencement Date is the date that the annuity is payable. Thus, if the participant is entitled to an annuity that is payable at age 65, under the front-loaded aspect of the Plan, interest credits continue to accrue until age 65, even if the participant separates from employment with Georgia-Pacific before age 65.

Under the Plan a participant may elect, under certain specified conditions, to receive his accrued

---

Xerox Corp., Countrymark Cooperative, and Blue Cross/Blue Shield of New Jersey have adopted these plans. *See* Wyatt, *supra.* More than 300 companies, with hundreds of billions of dollars in pension assets, have switched from traditional pension plan formulas to cash balance plans. *See Q-and-A: What You Need to Know About Today's "Cash-Balance" Plans,* Payroll Manager's Report, Feb. 2000, at 3.

[3]The Pension Benefit Guaranty Corporation is "a wholly owned United States Government corporation ... modeled after the Federal Deposit Insurance Corporation," whose Board of Directors "consists of the Secretaries of the Treasury, Labor, and Commerce." *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 636-37, 110 S.Ct. 2668, 2671, 110 L.Ed.2d 579 (1990). It "administers and enforces Title IV of ERISA." *Id.* at 637, 110 S.Ct. at 2671.

pension benefits in an optional lump sum form, payable immediately, rather than as an annuity commencing at age 65. If the participant elects this option, the amount payable under the Plan is a single sum equal to the amount in the participant's Personal Account (the hypothetical bookkeeping account).[4] It is this feature of the plan—the provision that the lump sum payout is the amount in the Personal Account at the time—that is at issue in this case.

### B. Facts

From 1965 until 1990, Jerry L. Lyons was employed as a paper inspector and paper tester for Great Northern Corporation. In 1990, Georgia-Pacific Corporation acquired Great Northern. As a result of the acquisition, Lyons became an employee of Georgia-Pacific, Great Northern's pension plan was merged with the Georgia-Pacific Salaried Employees Retirement Plan (which we are calling "the Plan"), and Lyons became a participant of it.

On January 5, 1991, Lyons left employment at Georgia-Pacific. In accordance with Article 4 of the Plan, Lyons was entitled to a vested benefit, because he had worked for Georgia-Pacific and Great Northern for at least five years. Pursuant to section 1.1 of the Plan, Lyons' accrued pension benefit was an annuity commencing at age 65. In November 1992, Lyons elected to receive his accrued pension benefit in the optional lump sum form, payable immediately, as he was permitted to do under section 6.4(a) of the Plan. Consistent with the Plan's payout provision for lump sums, Georgia-Pacific distributed to Lyons in January of 1993 a lump sum equal to the amount credited to his Personal Account—$36,109.15. *See Lyons,* 66 F.Supp.2d at 1329, 1332.

Two months after receiving his lump sum, Lyons consulted with the National Center for Retirement Benefits ("NCRB")[5] and was told by it that Georgia-Pacific had distributed to him substantially less than the

---

[4]Under the Plan at Section 6.4(a), "Option C" is:

> A single lump sum payment equal to the amount credited to the Participant's Personal Account as of the end of the month preceding his Benefit Commencement Date.

[5]The NCRB is a for-profit consulting firm that works on a contingent fee basis reviewing pension payouts on behalf of individual participants and advocating for them at the administrative level. *See*

amount he was entitled to receive under ERISA § 203(e), *see* 29 U.S.C. § 1053(e), at least as that statutory provision had been interpreted in Treasury Regulation 1.411(a)-11 and Treasury Regulation 1.417(e)-1.

We will discuss those Treasury regulations more later, but at this juncture it is enough to say that Georgia-Pacific did not follow them. If it had, instead of merely paying Lyons a lump sum equal to the amount credited to his Personal Account, which was $36,109.15, Georgia-Pacific would have taken the value of the annuity Lyons would have received at age 65 and discounted it to present value by using the PBGC rate.[6] That approach, following the Treasury regulations, would have yielded Lyons a lump sum payout of $49,341.83. *See Lyons,* 66 F.Supp.2d at 1332. The validity of the Treasury regulations is thus a question worth $13,232.68 to Lyons.[7]

### C. Procedural History

In a letter dated March 18, 1996, the NCRB, acting on behalf of Lyons, advised Georgia-Pacific that Treasury Regulation 1.417(e)-1 requires a minimum lump sum payable from a defined benefit plan to be no less than the present value of the participant's normal retirement benefit; and that the present value of Lyons' normal retirement benefit exceeded the amount in his Personal Account, which was the amount he was paid. The NCRB's letter requested that Georgia-Pacific recalculate Lyons' benefit in accordance with Treasury Regulation 1.417(e), and pay Lyons the shortfall.

Georgia-Pacific responded to the NCRB on April 17, 1996, taking the position that: the Plan is a "special" form of defined benefit plan known as a "cash balance plan;" IRS Notice 96-8 notes that cash balance plans define benefits for each employee by reference to a hypothetical account balance; most cash balance plans permit the distribution of an employee's accrued benefit in the form of a single sum equal to

---

*Senate Committee Holds Hearing on Pension Benefit Miscalculations,* Pension & Benefits Week Newsletter (RIA Group), June 23, 1997. Where its administrative representation proves unsuccessful, the NCRB has been known to refer cases to attorneys for class action lawsuits. *See Mathews v. Sears Pension Plan,* No. 95 C 1988 (N.D.Ill. April 23, 1996).

[6]At that time the PBGC rate was approximately 4.5 percent. *See Lyons,* 66 F.Supp.2d at 1336.

[7]At oral argument counsel for Lyons and the class stated that the difference for the class as a whole could be around $20 million.

the employee's hypothetical account balance; Lyons' "lump sum distribution was not calculated with reference to the present value of a normal retirement benefit;" and instead, the amount distributed to Lyons was the amount credited to his Personal Account.

On April 14, 1997, Lyons, on behalf of himself and other similarly situated persons, filed a class action complaint against Georgia-Pacific and the Plan (collectively "Georgia-Pacific") alleging that the method used to pay lump sum cash distributions under the Plan violated ERISA § 203(e)(2), 29 U.S.C. § 1053(e)(2).[8] After Georgia-Pacific answered the complaint, the district court in September of 1997 certified a class under Rule 23(b)(3), and it defined the class follows:

> All participants (or beneficiaries of participants) in the [Plan] (i) who received a lump sum distribution of benefits calculated at a time when such participants had a vested interest in the Plan and who (ii) received a distribution of benefits in a lump sum where (iii) at the date as of which the amount of the lump sum was calculated, the lump sum was lower than the present value, if determined using the "applicable interest rate" as defined in Internal Revenue Code Section 417(e)(3) and set forth in Treasury Regulations issued pursuant to Internal Revenue Code Section 417(e), of such participants' accrued benefit, as defined under ERISA.

Dist. Ct. Consent Order (September 29, 1997). Thereafter, the parties informed the district court that they "would prefer to seek a ruling from the Court as to the threshold issue of potential liability as to any class member before engaging in costly and time consuming discovery on issues pertaining to individual class members (or groups thereof), damages, or class membership." Dist. Ct. Consent Order (March 11, 1998). On March 11, 1998, the court accommodated the parties by entering a consent order permitting them to file summary judgment motions on that threshold liability issue. *See id.* at 1-2. The order provided that if the court's ruling on that issue did not dismiss or otherwise resolve the case, there would be a period during which the parties could "conduct discovery on issues pertaining to defenses as to claims of individual class members or groups thereof, class membership, damages, and similar issues." *Id.* at 2.

In its ensuing motion for summary judgment, Georgia-Pacific argued that the interest rate restrictions set forth in ERISA § 203(e)(2) apply exclusively to involuntary lump sum distributions of $3,500 or less, and

---

[8]Lyons has standing to sue for benefits because he was a participant in the Plan as defined by ERISA § 3(7). *See* 29 U.S.C. § 1002(7); *see generally Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115-18, 109 S.Ct. 948, 957-58, 103 L.Ed.2d 80 (1989) (interpreting the term "participant" in § 1002(7)).

because Lyons and the other class members received a voluntary lump sum distribution, the statute was inapplicable. Georgia-Pacific further argued that: ERISA § 204(c)(3) and Internal Revenue Code ("IRC") § 411(c)(2) permitted distribution of the Personal Account as the entire accrued benefit; Georgia-Pacific was entitled to rely upon a good faith exception in IRS Notice 96-8 (a notice Lyons argued supports his claim); and two IRS determination letters exonerated it from liability.

On March 22, 1999, the district court granted summary judgment for Georgia-Pacific. Relying upon the statutory language cited by Georgia-Pacific, the court held that the interest rate provisions contained in ERISA § 203(e)(2) apply only for the purpose of determining if a participant must consent to the distribution of a lump sum, and there exists no legislative authority in either the language of the statute or elsewhere requiring lump sum distributions to be computed in accordance with those interest rate provisions. Therefore, the court concluded, Treasury Regulation 1.411(a)-11 was "an unreasonable construction of ... ERISA § 203(e)." *Lyons,* 66 F.Supp.2d at 1336.

On April 2, 1999, the district court entered an amended order and final judgment, certifying the class under Federal Rule of Civil Procedure 23(b)(1)(A) and Federal Rule of Civil Procedure 23(b)(2). The court made no change in the definition of the class. Lyons timely appealed the amended order and final judgment.

## II. DISCUSSION

The principal dispute in this case is about whether ERISA § 203(e), 29 U.S.C. § 1053(e), and the Treasury regulations interpreting that provision required Georgia-Pacific to calculate Lyons' lump sum benefit by determining the amount he would have received at the normal retirement age of 65 and then discounting that amount back to the present value using the PBGC discount rate. It may help to explain why that matters.

As we have said, because the Plan is "front-loaded," interest credits to a participant's Personal Account continue after separation from employment until the normal retirement date, which is specified by the Plan to be age 65. Another important feature of the Plan is that the interest credit rate it provides is higher than the maximum discount rate prescribed in ERISA § 203(e). As a result, if the Plan's interest credit rate is applied to the Personal Account balance at separation and projected forward to determine what the normal

retirement benefit would be at age 65, and that benefit is then reduced to a present value using the maximum discount rate, the resulting amount will be more than what is in the Personal Account before the calculations are done.[9] The amount of the difference will be the result of two factors—the time until age 65 (the longer the time, the greater the difference) and the amount the interest credit rate exceeds the prescribed maximum discount rate (the more it does, the greater the difference). Pinning our explanation to the facts of this case, the difference of $13,232.68 between the balance in Lyon's Personal Account, which is what he was paid under the Plan, and the amount he claims he is entitled to results from the .75 percent difference between the higher interest credit rate established in the Plan and the discount rate prescribed by PBGC, carried over the time between the payout of his lump sum distribution and his normal retirement date. If the plan had pegged the interest credit rate to the prescribed maximum discount rate, there would have been no difference (regardless of the time factor), and no dispute. But it did not, so there is a dispute.

The district court held that the Treasury regulation requiring that any lump sum cash payout be calculated by applying the PBGC discount rate to the normal retirement benefit under the plan was invalid. We review that holding *de novo*. *See Lee v. Flightsafety Services Corp.,* 20 F.3d 428, 431 (11th Cir.1994).

*A. The Statute, Code Sections, and Regulations*

In 1974, Congress enacted ERISA, 29 U.S.C. § 1001, *et. seq.,* to protect the interests of employees by ensuring that they received the pension benefits to which they were entitled. *See* ERISA § 2, 29 U.S.C. § 1001. Ten years later, Congress enacted the Retirement Equity Act, which amended ERISA and the Internal Revenue Code to "improve the delivery of retirement benefits and provide for greater equity under private pension plans for workers and their spouses and dependents...." S.Rep. No. 98-575 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547. As part of that 1984 legislation, Congress added § 203(e) to ERISA and a materially identical § 417(e) to the Internal Revenue Code. Those added provisions made the PBGC rate the maximum interest rate a plan could use to discount to present value a normal retirement benefit for purposes

---

[9]Stated another way, but equally true, when a cash balance plan's interest credit rate is greater than the discount rate applied, the participant's account balance will be less than the present value of the normal retirement benefit.

of determining whether the amount to be distributed exceeded the cap on involuntary lump sum distributions.

After the 1984 enactment, ERISA § 203(e) read in its entirety as follows:

(e) Restrictions on mandatory distributions

(1) If the present value of any accrued benefit exceeds $3,500, such benefit shall not be treated as nonforfeitable if the plan provides that the present value of such benefit could be immediately distributed without the consent of the participant.

(2) For purposes of paragraph (1), the present value shall be calculated by using an interest rate not greater than the interest rate which would be used (as of the date of the distribution) by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump sum distribution on plan termination.

ERISA § 203(e), 29 U.S.C. § 1053(e) (1985).[10]

Two years later, Congress enacted the Tax Reform Act of 1986. Among other things, that legislation amended ERISA § 203(e)(2) and the parallel IRC § 417(e)(3) by adding new provisions relating to the calculation of the present value of an accrued benefit. One of those provisions permitted the use of a discount rate up to 120% of the applicable PBGC interest rate if the vested accrued benefit exceeded $25,000 using the PBGC rate. The other provision clarified that the present value determined under the 120% rate could not be less than $25,000. *See* Tax Reform Act of 1986, Pub.L. No. 99-514, §§ 1139(b), (c), 100 Stat. 2085.

After those amendments were made in the Tax Reform Act of 1986, this is how ERISA § 203(e) read:

---

[10]Although the text and the heading of the provision enacted in 1984 dealt only with calculating amounts for purposes of the restriction on mandatory distributions, the Senate Report spoke in broader terms. The pertinent part of it said:

> *For purposes of determining the present value of the participant's benefit,* the bill provides that a plan may not use an interest rate that is greater than the rate used by the Pension Benefit Guaranty Corporation (PBGC) for valuing a lump sum distribution upon plan termination.
>
> *For purposes of calculating the present value of a benefit as of the date of the distribution,* the plan is required to use an interest rate no greater than the rate used by the Pension Benefit Guaranty Corporation (PBGC) in valuing a lump sum distribution upon plan termination ...

S. Rep. No. 98-575 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 2549, 2562 (emphasis added). This legislation was not specifically tailored to cash balance plans—which did not even begin to appear until 1985, *see supra* n.2—but was instead aimed at defined benefit plans in general.

(1) If the present value of any nonforfeitable benefit with respect to a participant in a plan exceeds $3,500, the plan shall provide that such benefit may not be immediately distributed without the consent of the participant.

(2)(A) For purposes of paragraph (1), the present value shall be calculated—

(i) by using an interest rate no greater than the applicable interest rate if the vested accrued benefit (using such rate) is not in excess of $25,000,

and

(ii) by using an interest rate no greater than 120 percent of the applicable interest rate if the vested accrued benefit exceeds $25,000 (as determined under clause (i)).

In no event shall the present value determined under subclause (II)[sic] be less than $25,000.

(B) For purposes of subparagraph (A), the term "applicable interest rate" means the interest rate which would be used (as of the date of the distribution) by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump sum distribution on plan termination.

(3) This subsection shall not apply to any distribution of dividends to which section 404(k) of Title 26 applies.

29 U.S.C. § 1053(e) (1990).[11]  This subsection of ERISA, and the parallel Internal Revenue Code subsection, have been amended several times since the Tax Reform Act of 1986.  However, none of those amendments occurred until after Lyons had elected in November of 1992 to receive his lump sum benefit and had been paid it in January of 1993.  We will confine our analysis to the law applicable to Lyons and those similarly situated.[12]

---

[11]In 1989, Congress enacted the Omnibus Budget Reconciliation Act of 1989.  That Act made minor changes to paragraph (1) of ERISA § 203(e), but did not alter paragraph (2), which is the relevant paragraph in this case.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, §§ 7682, 7891, 103 Stat. 2106, 2434, 2445.

[12]One amendment in particular, made by the Retirement Protection Act of 1994, may have altered the legal landscape insofar as Treasury Regulation 1.411(a)-11 is concerned.  *See* Retirement Protection Act of 1994, P.L. 103-465, § 767(c), 108 Stat. 4809, 5039 (codified as amended at 29 U.S.C. § 1053(e)); *see also infra* 26-27.  That amendment may or may not portend a different result for plan participants who received lump sum distributions after its effective date.  But Lyons received his distribution before the effective date of the 1994 legislation, and is therefore not affected by it.  *See infra* n. 31. When we refer throughout this opinion to those "similarly situated" to Lyons, we mean in terms of that amendment, i.e., those who received their distributions before the effective date of the Retirement Protection Act of 1994 amendment to ERISA § 203(e).

As we will discuss later, there are class representation problems relating to those who

Many ERISA sections have parallel provisions in the Internal Revenue Code, tax provisions that are worded in ways materially identical to the ERISA sections.[13] ERISA § 203(e) is such a provision. Its tax counterparts are IRC §§ 411(a)(11) and 417(e). ERISA itself provides that Treasury regulations promulgated under IRC §§ 410(a), 411 and 412 are equally applicable to the parallel provisions of ERISA. *See* ERISA § 3002(c), 29 U.S.C. § 1202(c)[14]; 29 C.F.R. § 2530.200a-2 ("Regulations prescribed by the Secretary of the Treasury or his delegate under sections 410 and 411 of the [Internal Revenue] Code (relating to minimum standards for participation and vesting) shall apply for purposes of sections 202 through 204 [of ERISA]"); *Williams v. Cordis Corp.,* 30 F.3d 1429, 1431 n. 2 (11th Cir.1994); *see also* 26 U.S.C. § 7805 ("[T]he Secretary [of the Treasury] shall prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code.).

Because of the law discussed in the preceding paragraph, Treasury Regulation 1.411(a)-11 which interprets IRC § 411(a)(11) is equally applicable to ERISA § 203(e). That Treasury regulation, which was issued in 1988, sets forth the same discount rate restrictions as ERISA § 203(e), but goes further to clearly specify that the present value of *any* optional form of benefit (a lump sum payout is an optional form of benefit), cannot be less than the present value of the participant's normal retirement benefit. Treasury Regulation 1.411(a)-11 states in pertinent part:

(a) Scope—(a)(1) In general. Section 411(a)(11) restricts the ability of a plan to distribute any

---

elected lump sum payouts and received them after the effective date of the Retirement Protection Act of 1994. *See infra* Part II. E.

[13]"The reason that many ERISA sections have such counterparts in the IRC is that, to encourage employers to establish pension plans, Congress provides favorable tax treatment for plans which comply with ERISA's requirements." *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1144 n. 6 (3rd Cir.1993) (citation omitted).

[14]ERISA § 3002(c) provides:

Regulations prescribed by the Secretary of the Treasury under [Internal Revenue Code] sections 410(a), 411 and 412 of Title 26 (relating to minimum participation standards, minimum vesting standards, and minimum funding standards, respectively) shall also apply to the minimum participation, vesting and funding standards set forth in parts 2 and 3 of subtitle B of subchapter I of this chapter.

portion of a participant's accrued benefit without the participant's consent. *Section 411(a)(11) also restricts the ability of defined benefit plans to distribute any portion of a participant's accrued benefit in optional forms of benefit without complying with specific valuation rules for determining the amount of the distribution....*

\* \* \*

(d) Distribution valuation requirements. In determining the present value of any distribution of any accrued benefit from a defined benefit plan, the plan must take into account specified valuation rules. For this purpose, the valuation rules are the same valuation rules for valuing distributions as set forth in section 417(e); see § 1.417(e)-1(d) ... *This paragraph also applies whether or not the participant's consent is required under paragraphs (b) and (c) of this section.*

26 C.F.R. § 1.411(a)-11 (emphasis added). The "rules for valuing distributions as set forth in section 417(e)," which are incorporated into Treasury Regulation 1.411(a)-11(d), are the same ones set forth in ERISA § 203(e) as interpreted in Treasury Regulation 1.417(e)-1(d).[15] Those valuation rules include this one: "The present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit...." Treas. Reg. § 1.417(e)-1(d). Thus, Treasury Regulation 1.411(a)-11(d) clearly provides that ERISA § 203(e), and the discount interest rates it prescribes, applies to consensual as well as non-consensual lump sum distributions. That means Georgia-Pacific loses most of the battle involving the threshold liability issue, if this Treasury regulation is valid.[16]

The district court held that the interest rate restrictions set forth in ERISA § 203(e)(2), 29 U.S.C. § 1053(e)(2), apply solely for the purpose of determining whether the participant's consent is required before the accrued benefit may be distributed in the form of a lump sum. That conclusion is due to be affirmed only if we agree with the district court's holding that Treasury Regulation 1.411(a)-11 is invalid to the extent it provides to the contrary. We turn now to the critical issue of whether that Treasury regulation is due deference, and thus is to be upheld, under the *Chevron* doctrine.

### B. *Chevron* Analysis

---

[15]To avoid further complicating an already complex discussion, hereinafter when we refer to Treasury Regulation 1.411(a)-11, we mean to include, where relevant, the valuation rules that are contained in Treasury Regulation 1.417(e)-1, which are explicitly incorporated by Treasury Regulation 1.411(a)-11.

[16]Georgia-Pacific has other arguments and defenses, *see infra* Part II. C. & D., but the validity of this regulation is the big issue.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). For that and other reasons, agency regulations, like the one at issue here, are to be given deference "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. Bringing the general deference rule home to the ERISA area in particular, this Court has previously recognized that we "owe great deference to the interpretations and regulations of the Pension Benefit Guaranty Corporation ('PBGC'), the Internal Revenue Service ('IRS') and the Department of Labor, which are the administrative agencies responsible for enforcing and interpreting ERISA." *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.,* 848 F.2d 1164, 1167 (11th Cir.1988) (en banc).

In *Chevron,* the Supreme Court explained: "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43, 104 S.Ct. at 2781. Thus, our first step is to determine whether Congress' intent, as embodied in ERISA § 203(e) at the time of the payout to Lyons in 1993, is clear that the present value interest rate restrictions contained in that legislation are applicable only to involuntary lump sum distributions. If so, then that is "the end of the matter" and the provisions of Treasury Regulation 1.411(a)-11 to the contrary are invalid.

The intent of Congress behind this part of ERISA § 203(e), at least as it existed at the time Lyons received his distribution in 1993, is anything but clear on this issue. Paragraph (1) of ERISA § 203(e) provides that an involuntary lump sum distribution may not be made when the present value of the vested accrued benefit exceeds $3,500. Paragraph (2)(A) begins with the limiting phrase, "For purposes of paragraph (1)," which seems to indicate that the restrictions on calculating present value which follow that introductory language apply only to the calculation of whether the present value exceeds the $3,500 cap on

involuntary distributions contained in paragraph (1).[17]  But there is a strong contrary indication in paragraph (2) as well.

Clause (i) of paragraph (2)(A) specifies the applicable discount rate to be used "if the vested accrued benefit (using such rate) is not in excess of $25,000," and clause (ii) specifies a different, higher, discount rate to be used "if the vested accrued benefit exceeds $25,000 (as determined under clause (i))."  An additional, final sentence of paragraph (2) reiterates that "[i]n no event shall the present value determined under subclause (II) be less than $25,000,"[18] which is an amount higher than the $3,500 cap for non-consensual distributions set forth in paragraph (1).  What all of these references to amounts above and below $25,000 mean is that Congress must have had something other than involuntary distributions in mind, because the cap on them was clearly specified in paragraph (1) to be $3,500.  If Congress had intended to address only involuntary distributions, it would have used the $3,500 figure in place of the $25,000 figure in all three places in paragraph (2) of ERISA § 203(e).  The $25,000 references make sense only in the context of determining lump sum distributions not governed by the $3,500 cap, which is to say consensual ones.

Georgia-Pacific has never explained why, if ERISA § 203(e) applies only to non-consensual distributions, subparagraph (2) is replete with references to distribution amounts that can only be made with consent.  Instead, Georgia-Pacific places great emphasis on the introductory clause ("For purposes of paragraph (1) ..."), and it also points out that Congress did not change the heading of § 203(e)—"Restrictions on mandatory distributions"—when it made the 1986 amendments to that subsection of ERISA.  We have previously observed that "reliance upon headings to determine the meaning of a statute is not a favored method of statutory construction." *Scarborough v. Office of Personnel Management,* 723 F.2d 801, 811 (11th Cir.1984).  While section titles or headings may sometimes be useful to resolve ambiguity in a statute, the ambiguity here is extreme—the language of § 203(e) actually conflicts with itself.

---

[17]ERISA § 203(e), as it existed at that time, is set out in its entirety *supra* Part II. A.

[18]Everyone agrees that the reference to "subclause (II)" is a typographical error, and that the reference intended is to subclause or clause (ii).

Moreover, the heading upon which Georgia-Pacific relies originated in the 1984 legislation, before Congress added to ERISA § 203(e) the provisions in 1986 that caused the conflict. It is true that when Congress amended the subsection in 1986, it did not alter the heading of § 203(e).[19] Congressional inaction regarding an existing title is far too thin a reed to support a construction of a statutory provision that would effectively write out of it the very changes that Congress amended the provision to include. *Cf. Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous...."); *Bouchard Transp. Co. v. Updegraff,* 147 F.3d 1344, 1351 (11th Cir.1998) ("A basic principle of statutory construction is that a statute should not be construed in such a way as to render certain provisions superfluous or insignificant." (quoting *Woodfork v. Marine Cooks & Stewards Union,* 642 F.2d 966, 970-71 (5th Cir. Apr.1981) (internal quotations and citations omitted))).

The fairest statement that can be made about ERISA § 203(e) on its face is that it is ambiguous about the issue before us. There are indications pointing both ways, although it seems to us that the strongest ones point in the direction of ERISA § 203(e)'s present value restrictions applying to consensual as well as non-consensual lump sum distributions. Even if we view the ambiguity needle as pointing straight up, the Supreme Court has instructed us:

> [I]f a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the executive department's construction of a statutory scheme it is entrusted to administer, unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress.

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 233, 106 S.Ct. 2860, 2868, 92 L.Ed.2d 166 (1986) (internal quotations and citations omitted).

---

[19]However, later that year, the heading of ERISA § 203(e) was changed by the Office of the Law Revision Counsel. *See generally* 2 U.S.C. § 285b(4) (authorizing the Office of the Law Revision Counsel "[t]o classify newly enacted provisions of law to their proper positions in the [United States] Code where the titles involved have not yet been enacted into positive law"). The new heading for ERISA § 203(e), as it appeared in the Code from 1986 to 1994, was: "Consent for distribution; present value; covered distributions." That heading, of course, is less favorable to Georgia-Pacific's position than the one contained in the 1984 version of the legislation.

In the Retirement Protection Act of 1994, Congress removed the language relating to the calculation of present value amounts in excess of $25,000, thereby lessening (or perhaps removing) the ambiguity or self-contradictory nature of the § 203(e) provisions. That amendment may or may not compel a different conclusion as to lump sum distributions made after the effective date of the 1994 legislation. However, Lyons received his distribution in 1993 and the legal issues relating to that distribution, including the validity of Treasury Regulation 1.411(a)-11, are to be decided in view of the statute as it existed at that time.

Georgia-Pacific argues that in the 1994 legislation Congress simply "clarified" its earlier intent. Of course, the Retirement Protection Act of 1994 was enacted by a different Congress than the one that enacted the Tax Reform Act of 1986, which put in place the version of ERISA § 203(e) that we are interpreting. *See Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983)("[I]t is well settled that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") (internal quotations and citations omitted). Whatever effect the 1994 legislation may have on the issues as they relate to distributions after it was enacted, it does not affect our conclusion relating to the issues pertaining to distributions that occurred before then.

Because the language of ERISA § 203(e) itself is ambiguous, at least as it existed at the time Lyons received his distribution, we turn now to the legislative history to see if it "shows with sufficient clarity that the agency construction is contrary to the will of Congress." *Japan Whaling,* 478 U.S. at 233, 106 S.Ct. at 2868. Both parties cite to numerous statements found in the congressional record to support their respective positions. Lyons argues that statements found in the House Conference Report to the Tax Reform Act of 1986 confirm that Congress intended ERISA § 203(e)(2) to apply to all lump sum distributions.[20] That is the

_____

[20]The House Conference Report to the Tax Reform Act of 1986 stated:

> If the present value of the vested accrued benefit is no more than $25,000, then the amount to be distributed to the participant or beneficiary is calculated using the PBGC rate.

> If the present value of the accrued benefit exceeds $25,000 (using the PBGC interest rate), then the conference agreement provides that the amount to be distributed is determined using an interest rate no greater than 120 percent of the interest rate ... In no

legislation that created the textual conflict to begin with.

Labeling the 1986 legislative history itself "ambiguous," Georgia-Pacific prefers to direct our attention to statements found in the Senate Report to the 1984 legislation which first put ERISA § 203(e) on the books. Georgia-Pacific argues that earlier legislative history shows the discounting-to-present value methodology is limited to involuntary cash-outs of employee benefits.[21] The problem with that argument is that we are concerned with ERISA § 203(e), as amended by the 1986 legislation, not as it existed before.

---

event, however, is the amount to be distributed reduced below $25,000 when the interest rate used is 120 percent of the applicable PBGC rate.

For example, assume that, upon separation from service, the present value of an employee's total accrued benefit ... is $50,000 using the applicable PBGC rate. Under the conference agreement, the plan may distribute to this employee (if the employee and, if applicable, the employee's spouse consents) the total accrued benefit, calculated using 120 percent of the applicable PBGC rate (e.g., $47,000).

H.R. Conf. Rep. No. 98-841 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4576. Lyons argues that if the interest rate restrictions applied solely to the consent determination, the Conference Committee would not have stated that (1) the minimum distribution under the 120% rate is $25,000; and (2) if the amount computed utilizing the 120% rate is, for example, $47,000, the plan must distribute at least $47,000.

[21]The Senate Report to Retirement Equity Act of 1984 states:

Present Law

Under present law, in the case of an employee whose plan participation terminates, a pension, profit-sharing, or stock bonus plan (pension plan) may involuntarily "cash out" the benefit (i.e., pay out the balance to the credit of a plan participant without the participant's consent) if the present value of the benefit does not exceed $1,750....

Reasons for Change

The Committee believes that the limit on involuntary cash-outs should be raised to $3,500 in recognition of the effects of inflation on the value of small benefits payable under a pension plan.

Explanation of Provisions

The bill provides that, if the present value of an accrued benefit exceeds $3,500, then the benefit is not to be considered non-forfeitable if the plan provides that the present value of the benefit can be immediately distributed without the consent of the participant....

S. Rep. No. 98-575 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2569.

Georgia-Pacific also argues that Congress would have clarified § 203(e) in the Tax Reform Act of 1986 if it had wanted the provision to apply to consensual distributions as well as non-consensual ones. But the same can be said in the other direction: If Congress had wanted § 203(e) to apply only to non-consensual distributions, it could have clarified the provision in the Tax Reform Act of 1986 to so provide.

As the previous discussion indicates, the legislative history of § 203(e) provides no answer, much less a clear answer, to the issue at hand. Like the language of the provision, the legislative history is ambiguous. As a result, this is a prototypical situation where regulations are permissible, provided they are otherwise reasonable. We turn now to Georgia-Pacific's arguments that Treasury Regulation 1.411(a)-11 is unreasonable.

Georgia-Pacific contends that the Treasury regulation is unreasonable because, all other factors being equal, it produces benefits that are inversely proportional to the age of the participant at the time the lump sum distribution is taken. To the extent that the argument means the earlier a participant leaves employment the better the payout, that is not entirely true. While interest credits continue after separation from employment, service credits do not. The longer a participant stays employed under the Plan, the more service credits will be added to the accrued annuity, and the larger the effect the interest credit will have (because the interest credit is applied to the Personal Account balance which will grow with the addition of service credits). Moreover, those who design plans can reduce any perceived disparity by reducing or eliminating the difference between the statutory discount rate (which was derived from the PBGC rate at the time of Lyons' distribution) and the interest credit rate. To the extent that Treasury Regulation 1.411(a)-11 does make it easier for younger employees to leave an employer who has a front-loaded, cash balance defined benefit plan, we cannot say that consequence makes the regulation unreasonable in light of the fact that one arguable benefit of such plans is that they allow younger workers to take a larger benefit with them when changing jobs. *See Give Employees Meaningful Information When Pensions are Changed to Cash Balance Plans, Says*

*Actuary,* PR Newswire, May 7, 1999.[22]

Georgia-Pacific also argues that Treasury Regulation 1.411(a)-11 is unreasonable, because it will not work at all where the credit rate varies in response to some measure of market fluctuations, such as a stock or bond index. As an example, Georgia-Pacific posits a farfetched hypothetical.[23] We note that Georgia-Pacific has not cited any evidence or source indicating that such plans exist, or if they do exist, that they are anything but rare.[24] We will not strike down a regulation on the basis of a speculative hypothetical. Even if such plans do exist, the Plan before us is not one. We address the reasonableness of the Treasury regulation as it applies to the case before us, involving what we understand to be a not untypical type of front-loaded defined benefit plan with a fixed interest credit rate that permits consensual lump sum distributions before normal retirement age. We have no occasion to decide whether Treasury Regulation 1.411(a)-11 might be unreasonable as applied to a materially different plan, such as one in which the interest credit rate varies with market performance.

Because Congress has not spoken directly to the precise issue, because the legislative history is ambiguous, and because Treasury Regulation 1.411(a)-11 is not unreasonable, at least insofar as it applies

---

[22]Georgia-Pacific also contends that the practical effect of Treasury Regulation 1.411(a)-11 will be to cause employers to change plans so that the interest credit rate is no more than the statutorily prescribed maximum discount rate. There is nothing in the record or elsewhere that has been brought to our attention indicating that all or most employers will do so, nor are we prepared to say that if that were the effect it would make the regulation unreasonable in the *Chevron* sense.

[23]Georgia-Pacific points out that the S & P 500 gained approximately 28% in 1998, and posits that "[i]f future interest credits were based on the index, Lyons would be entitled to a 28% annual interest credit on his account balance until age 65 which then would be discounted by the PBGC rate (around 5%)." That would produce, Georgia-Pacific says, "a difference of hundreds of thousands (if not millions) of dollars between the actual account balance" and the one due under Lyons' theory. The hypothetical is farfetched, because it would be foolhardy for a plan to base future annual interest credits on any single year's performance of a market index or indicator. If the plan did, the normal retirement benefit under it could be thrown way out of whack, too, even if there were no early lump sum distributions.

[24]Lyons responds to this argument of Georgia-Pacific by suggesting that such a plan would not satisfy the IRC § 401(a)(25) requirement that pension benefits are to be "definitely determinable" in order for the plan to obtain and maintain qualified status under the Code. We have not had sufficient briefing on whether such a plan would tax qualify for us to be able to decide that issue, nor do we need to do so in order to dispose of the present case. But the existence of the tax qualification issue shows the speculative nature of Georgia-Pacific's hypothetical.

to the specific type of plan in this case, Treasury Regulation 1.411(a)-11 is due to be upheld under the *Chevron* decision. *See Atlantic Mut. Ins. Co. v. Comm'r,* 523 U.S. 382, 389, 118 S.Ct. 1413, 1418, 140 L.Ed.2d 542 (1998) ("The task that confronts us is to decide, not whether the Treasury regulation represents the best interpretation of the statute, but whether it represents a reasonable one." (citation omitted)); *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.") We turn now to Georgia-Pacific's contention that even if the Treasury regulation is valid, it does not apply to this specific Plan.

### C. Application to the Plan

Lyons argues that Georgia-Pacific violated Treasury Regulation 1.411(a)-11 by failing to project the amount in his hypothetical account to normal retirement age and then discount that figure back to present value using the maximum discount rate prescribed in ERISA § 203(e)(2). Three years after Lyons received his lump sum distribution, the IRS issued Notice 96-8, which required ERISA plans to do exactly what Lyons argues Georgia-Pacific was required to do at the time it distributed his lump sum benefit to him. *See* I.R.S. Notice 96-8, 1996-1 C.B. 359. IRS Notice 96-8 definitively states that the discounting-to-present value methodology found in IRC §§ 411 and 417 applies to cash balance plans. The notice explains that when calculating the lump sum distribution under a cash balance plan, "the balance of the employee's hypothetical account must be projected to normal retirement age and then the employee must be paid at least the present value, determined in accordance with [IRC] section 417(e) [one of the tax counterparts to ERISA § 203(e) ], of that projected hypothetical account balance." I.R.S. Notice 96-8 (material in brackets added).[25]

---

[25]IRS Notice 96-8 states that it was issued to provide "guidance concerning the requirements of section 411(a) and 417(e) with respect to the determination of the amount of a single sum distribution from a cash balance plan." *Id.* It advises that "in order to comply with 411(a) and 417(e) in calculating the amount of a single sum distribution under a cash balance plan, the balance of the employee's hypothetical account must be projected to normal retirement age and then the employee must be paid at least the present value, determined in accordance with section 417(e), of that projected hypothetical account balance." *Id.*

Notice 96-8 explains that if a plan's interest credit rate exceeds the statutory discount

Georgia-Pacific cannot be held accountable to Lyons for failing to comply with IRS Notice 96-8 per se, because it was released on January 18, 1996, which was *after* Lyons and those similarly situated to him had received their lump sum benefits.  A distribution ought to be judged in light of the law and any official guidance that existed at the time of the distribution.  Moreover, according to IRS Notice 96-8 itself, its purpose was not to promulgate binding rules, but to elicit opinions on "anticipated regulations."

Georgia-Pacific contends that until IRS Notice 96-8 was issued, there was no guidance suggesting that Treasury Regulation 1.417 would apply to cash balance plans in the manner advocated by Lyons.  It argues that even if this Court gives deference to the Treasury regulation, there was no indication at the time of Lyon's lump sum distribution that Georgia-Pacific should have projected the amount in Lyon's hypothetical account to normal retirement age and then discounted that amount back to present value using ERISA § 203(e)(2) and IRC § 417(e) rates.[26]  Georgia-Pacific says that until IRS Notice 96-8 all it was required to

rates set forth in IRC § 417(e), then payment of the participant's hypothetical account balance as the lump sum will result in a smaller benefit than the employee is entitled and thereby violate the anti-forfeiture rules in IRC § 411(a) and the present value requirements of IRC § 417(e).  The Notice also predicts that anticipated Treasury regulations will contain a list of interest credit rates described as "standard indices and associated margins."  Those rates are "assumed" not to exceed the Internal Revenue Code § 417(e) rate, and plans that utilize the proposed interest credit rates may distribute the hypothetical account balance without violating IRC § 417(e).  The Notice concludes with a subsection entitled "Guidance will be prospective," which provides a safe harbor for plans that rely on a "reasonable, good-faith interpretation of the applicable provisions of the [Internal Revenue] Code, taking into account pre-existing guidance."  *Id.*

[26]Georgia-Pacific's contention disregards a Treasury decision issued well before Lyons received his distribution.  On September 19, 1991, the Secretary of the Treasury issued Treasury Decision 8360 which, among other things, stated that cash balance plans must comply with IRC § 417(e) valuation rules even if the resulting lump sum amount would be greater than the amount in the participant's hypothetical account.  That Treasury Decision 8360 stated:

> Several commentators requested clarification of the treatment of cash balance plans, another hybrid plan design....  Comments indicated that cash balance plans are becoming increasingly popular.

> * * *

> Some of the comments involving cash balance plans ... requested that the final regulations provide special relief for cash balance plans from the requirements of section 417(e)....  These rates, when combined into a single blended rate, are sometimes lower than the rates used by existing cash balance plans in determining employees' cash

distribute as a lump sum was the amount in an individual employee's hypothetical account.[27] We are skeptical about whether lack of guidance and direction can be a defense to this type of action by a plan participant, and in any event Treasury Regulation 1.411(a)-11 when read against the Plan's own terms provides enough guidance that Georgia-Pacific is liable to plan participants even for distributions made before the issuance of IRS Notice 96-8.[28]

Reiterating some of the features of a cash balance plan is helpful in explaining Georgia-Pacific's obligations under the law as it existed at the time of Lyon's lump sum distribution. As we have explained before, a defined benefit, cash balance plan, such as this one, credits a hypothetical account with service credits and interest credits. Nevertheless, as a defined benefit plan, the plan "consists of a general pool of assets rather than individual dedicated accounts." *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439, 119

---

balances, and can therefore require a plan that does not use the section 417(e) rates to determine interest adjustments to pay an employee more than the amount of the employee's hypothetical cash balance when benefits are paid in a single sum. The Treasury and the Service have determined that such relief cannot be granted consistent with the requirements of section 417(e). However, in order to minimize the occasions when this problem will arise, the final regulations include a blended section 417(e) interest rate among the alternative safe harbor interest rates a cash balance plan may use in determining interest adjustments.

T.D. 8360, 56 Fed Reg. 47524, 47528 (1991). Thus, the Treasury Department had put employers on notice of its position that the law required cash balance plans to use the statutory rates in IRC § 417(e), at the time Lyons received his payout, to discount to present value the normal retirement benefit that would have been received if an early lump sum distribution had not been elected.

[27]Along these lines, Georgia-Pacific argues that ERISA § 204(c)(2)(C) permitted it to limit the lump sum distribution to Lyons' Personal Account Balance. But ERISA § 204(c)(2)(C) addresses situations involving "accumulated contributions," which are defined as those that include "mandatory contributions made by the employee." 29 U.S.C. § 1054(c)(2)(C)(i). The Plan in this case did not require or permit employee contributions, so the provision Georgia-Pacific relies upon does not apply.

[28]IRS Notice 96-8 contains a "safe harbor" clause that protects from tax disqualification a plan in which pre-Notice distributions were made inconsistently with the provisions of the notice "if the amount of the distribution satisfied those [applicable Internal Revenue Code] sections based on a reasonable, good-faith interpretation of the applicable provisions of the Code, taking into account pre-existing guidance." I.R.S. Notice 96-8. It is by no means clear that Georgia-Pacific could meet the requirements of that "safe harbor." *See* discussion of Treasury Decision 8360 *supra* n. 26. Even if Georgia-Pacific could meet those requirements, it would be safely harbored only from tax disqualification, not from liability to plan participants.

S.Ct. 755, 761, 142 L.Ed.2d 881 (1999). In a cash balance type of defined benefit plan, "[t]he total assets on deposit do not generally equal the total of all balances maintained for participants." Brown, *supra* note 1, at 83. "[T]he employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments." *Hughes Aircraft Co.,* 525 U.S. at 439, 119 S.Ct. at 761 (citing *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 232, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (O'Connor, J. concurring)).

Because the plan here is a defined benefit plan, the individual employees "have a right to a certain defined level of benefits, known as 'accrued benefits.' " *Id.* at 440, 119 S.Ct. at 761. "That term, for purposes of a defined benefit plan, is defined as 'the individual's accrued benefit determined under the plan [and ordinarily is] expressed in the form of an annual benefit commencing at normal retirement age.' " *Id.* (quoting ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A)).[29] The Plan involved in this case defines "Accrued Benefit" as follows:

> Accrued Benefit means, as of the time of reference, a monthly amount of benefit, payable in the form of an increasing life annuity, commencing on a Participant's Normal Retirement Date, where the amount of such monthly benefit is the result of dividing the then credits to such Participant's Personal Account by the applicable factor from Section A of Appendix A.

Unlike a defined contribution plan, the "accrued benefit" under this Plan is not the amount in the Participant's Personal Account, but rather an amount *derived from* that hypothetical account. Thus, Lyons did not have a statutory right to the amount found in his hypothetical account prior to the normal retirement date, and Georgia-Pacific did not have a right to limit any distribution to him to that amount. Instead, after five years of work, Lyons earned a vested interest in an amount at normal retirement age, to be calculated under the Plan by projecting forward the amount in his hypothetical account using the interest credit rates specified in the Plan.

Treasury Regulation § 1.417(e)-1, which was in effect at the time of the distribution, unequivocally

---

[29]"By contrast, an 'accrued benefit' for purposes of defined contribution plans means 'the balance of the individual's account.' " *Hughes Aircraft Co.,* 525 U.S. at 440 n. 3, 119 S.Ct. at 761 n. 3 (quoting ERISA § 3(23)(B); 29 U.S.C. § 1002(23)(B)).

states that "[t]he present value of *any* optional form of benefit cannot be less than the present value of the *normal retirement benefit* determined in accordance with this paragraph." Treas. Reg. § 1.417(e)-1(d) (emphasis added). "Any" means exactly what it says. *See Lyes v. City of Riviera Beach, Florida,* 166 F.3d 1332, 1337 (11th Cir.1999) (en banc) (when no limiting language is used " 'any' means all.") (internal quotations and citations omitted). "[A]ny optional form of benefit" includes a pre-retirement lump sum benefit, which means that such a lump sum distribution cannot be less than "the present value of the normal retirement benefit determined in accordance with" the Treasury regulation.

The "normal retirement benefit" itself, before it is discounted to present value, is determined in accordance with the Plan. It is the amount a participant would have received at age 65 under the Plan but for the election to take an early lump sum distribution. *See* Treas. Reg. § 1.417(e)-1. To determine the normal retirement amount Lyons would have received at age 65, the Plan specifies that his hypothetical account balance must be projected forward using the interest credit rates set forth in the Plan. It is the Plan itself, rather than the Treasury regulations, that requires the hypothetical account balance to be projected forward using the credit interest rate, and it is the Plan itself that specifies the interest credit rate to be applied for that purpose. What the Treasury regulation adds is that once the normal retirement benefit is ascertained in accordance with the Plan, that amount is then to be discounted to present value using the PBGC rate in order to calculate the lump sum distribution to which the participant is entitled.

For these reasons, we conclude that Treasury Regulation 1.411(a)-11, which was issued in 1988, requires that lump sum distributions under the Plan be calculated by determining what would have been the normal retirement benefit had the participant not elected to take an early lump sum distribution, and then discounting that amount to present value using the PBGC rate prescribed in ERISA § 203(e). Distribution of the hypothetical account balance alone is not enough where, as here, the interest credit rate exceeds the PBGC rate.

### D. The IRS Determination Letter

In 1989 the IRS issued Georgia-Pacific a determination letter stating that the Plan was tax qualified.

Georgia-Pacific argues that based upon that letter it cannot be held liable for any underpayment of benefits to Lyons and those similarly situated. The reasoning is that in determining the plan was tax qualified the IRS must have concluded that distributing the participant's Personal Account complied with IRC § 417(e), the Internal Revenue Code subsection that parallels ERISA § 203(e).

The one-page determination letter makes no mention at all of the lump sum payment provision, nor is there any indication in the letter that the IRS considered that provision of the Plan, much less the issue now before us. In its amicus brief the IRS urges us not to consider the letter, because it "may have erroneously overlooked the plan provision" for lump sum payments. Because it does not specifically address the issue at hand, the IRS letter is not owed any deference. *See Hickey v. Chicago Truck Drivers, Helpers & Warehouse Workers Union,* 980 F.2d 465, 469 (7th Cir.1992) ("Given the informal nature of these letters, the express limitations included in the IRS letter, and the absence of any reasoning to explain the basis for the statements, we do not think that any implication in either of these letters ... is entitled to deference."); *In re Gulf Pension Litigation,* 764 F.Supp. 1149, 1172 (S.D.Tex.1991) ("[T]he Court also finds that the IRS determination is due no deference because it evidences no investigation or legal analysis of the facts by the IRS."). The letter may protect the Plan from adverse tax treatment, but it does not protect the Plan from liability to participants.[30]

### E. Class Representative Problems

The Plan in this case was changed to a cash balance defined benefit plan by an amendment that became effective January 1, 1989. Thereafter, and until the Plan was amended in 1997, it utilized an interest credit rate that was higher than the statutorily prescribed maximum discount rate. The class the district court defined covered all of those who had received lump sum distributions under the Plan that were lower than the present value of their accrued retirement benefit would have been if calculated using the statutorily

---

[30]The same is true of an IRS determination letter Georgia-Pacific received in 1997, after it made amendments to the Plan that are not relevant to the issue in this case. We mention that second letter only in a footnote, because it was issued long after Lyons and those similarly situated with him had received their distributions.

prescribed discount rate.

Lyons, who is currently the only class representative, received his lump sum distribution in January of 1993. The version of ERISA § 203(e) on the books at that time had remained unchanged in any material way since amendments were made to it by the Tax Reform Act of 1986, and that version continued in effect without material change until amended by the Retirement Protection Act of 1994. Thus, from all that appears Lyons is an adequate representative for all class members who received their lump sum distributions before the 1994 amendment took effect.[31] He suffered the same type of injury as they did, and the law applicable to his claim is the same as that applicable to theirs.

However, Lyons is not an adequate representative for those class members who received their lump sum distributions after the effective date of the 1994 amendment, because their claims are governed by ERISA § 203(e) as amended by that legislation. Lyons has no interest in whether the 1994 amendment altered the legal landscape for those who received distributions thereafter. It does not matter to him, for example, whether the amended language is sufficiently free of ambiguity that the *Chevron* analysis may come out differently. *See supra* Part II. B. Even if it does, that will not affect his claim which is governed by pre-1994 law.

As we have explained before:

> Among the prerequisites to the maintenance of a class action is the requirement of Rule 23(a)(4) that the class representatives "will fairly and adequately protect the interests of the class." The purpose of this requirement, as of many other of Rule 23's procedural mandates, is to protect the legal rights of absent class members. Because all members of the class are bound by the res judicata effect of the judgment, a principal factor in determining the appropriateness of class certification is "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class."

*Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir.1987) (citations omitted). We cannot expect Lyons to assert with "forthrightness and vigor" those interests of other class members that he does not share

---

[31]The 1994 legislation specifies that the relevant amendment "shall apply to plan years and limitation years beginning after December 31, 1994; except that an employer may elect to treat the amendments made by this section as being effective on or after the date of enactment of this Act [December 8, 1994]." Retirement Protection Act of 1994, P.L. 103-465, § 767(d), 108 Stat. 4809, 5039. *See also* ERISA § 205(g)(3)(B), 29 U.S.C. § 1055(g)(3)(B).

and in which he has no stake. Indifference as well as antagonism can undermine the adequacy of representation.[32]

Because there is no adequate class representative before us to advocate the interests of those who received their lump sum distributions after the effective date of the amendment that the Retirement Protection Act of 1994 made to ERISA § 203(e), we have declined to decide whether Treasury Regulation 1.411(a)-11 is a valid regulation insofar as it concerns those distributions. *See supra* 3383-84. On remand, if an adequate class representative appears to advocate the interests of those who have a stake in that issue, the district court should proceed to decide that issue, and any other issues concerning the threshold liability question that relate particularly to those class members, in the first instance.

### III. CONCLUSION

Treasury Regulation 1.411(a)-11 is a reasonable and valid interpretation of ERISA § 203(e), as it existed prior to its amendment by the Retirement Protection Act of 1994, at least as that provision applies to defined benefit cash balance plans with fixed interest credit rates. The district court's judgment, which is based on a holding to the contrary, is due to be reversed.[33]

---

[32]We realize, of course, that class issues, including those relating to the adequacy of representation requirement, are ordinarily raised in the district court whose rulings on such issues are reviewed only for an abuse of discretion. However, the circumstances here are a bit unusual. The district court held that no class member, including Lyons, was entitled to any relief because Treasury Regulation 1.411(a)-11 was unreasonable and invalid even as it applied to those who received their distributions before the effective date of the 1994 amendment to ERISA § 203(e). Lyons appears to have been an adequate representative of all those in the class as to that issue. But now that we have reversed the district court's holding, the issue concerning the adequacy of representation involving distributions made after the 1994 amendment arises. Adequacy of representation issues implicate due process, *see In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1083 (6th Cir.1996), and may be addressed throughout the litigation, *see Barney v. Holzer Clinic, Ltd.,* 110 F.3d 1207, 1213-14 (6th Cir.1997)(court of appeals *sua sponte* narrowing class definition and limiting judgment accordingly); *cf.* 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1765, at 293 (2d ed. 1986) ("[A] favorable decision under Rule 23(a)(4) is not immutable. If later events demonstrate that the representatives are not adequately protecting the absentees, the court may take whatever steps it thinks necessary under Rule 23(c) or Rule 23(d) at that time.")

[33]As we mentioned earlier in this opinion, the district court at the urging of the parties addressed only the threshold liability issue of potential liability to any class member, and left for the future discovery and decision of other issues that might arise if potential liability were found. *See supra* Part I.C. We leave those issues and any additional defenses Georgia-Pacific may have that are not inconsistent with our holdings in this opinion to be decided on remand.

REVERSED and REMANDED for further proceedings consistent with this opinion.