**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,**

**v.**

**The WILSON N. JONES MEMORIAL HOSPITAL, Defendant.**

**No. 4:01–CV–94.**

United States District Court,
E.D. Texas,
Sherman Division.

March 14, 2003.

Mark A. Amadeo and Garth D. Wilson, Office of the General Counsel, Pension Benefit Guaranty Corp. Washington, DC, for Plaintiff.

David R. Levin of Wiley, Rein & Fielding, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DAVIS, District Judge.

This case is before the Court on cross-motions for summary judgment (Plaintiff's motion Docket No. 25; Defendant's motion Docket No. 26). Having considered the motions and the summary judgment record and having heard arguments of counsel, the court **GRANTS** Plaintiff's motion and **DENIES** Defendant's motion.

## BACKGROUND

Plaintiff Pension Benefit Guaranty Corporation ("PBGC") is a United States government corporation that regulates the pension plan termination insurance program established under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. §§ 1301–1461. In order to regulate pension plan terminations, PBGC is required to annually audit a statistically significant number of terminating plans. 29 U.S.C. § 1303(a). Defendant Wilson N. Jones Memorial Hospital ("the Hospital") sought to terminate its "Retirement Plan for Employees" ("the Plan") through a process initiated in 1995. This case arises out of PBGC's determination that the Plan was not terminated in compliance with Title IV of ERISA. More specifically, PBGC contends that the Hospital used an interest rate greater than the rate permitted under ERISA and the Internal Revenue Code ("IRC") resulting in about 800 Plan participants being underpaid in an amount exceeding $3 million, plus interest.

A brief factual recitation is in order. The Hospital, in addition to being the Plan's contributing sponsor, was also Plan

administrator. Before the termination process began in 1995, all benefits under the Plan, with one exception, were annuitized, that is, payable monthly; the exception was that benefits valued at less than $3,500.00 had to be paid in a lump sum. Such lump sums were calculated under a formula that used an "Annuity Starting Date." The Plan defined "Annuity Starting Date" as having the "meaning assigned in Section 417(f) of the Internal Revenue Code [1] and regulations issued with respect thereto and shall be the first day of the first period for which an amount is payable (not the actual date of payment) as an annuity or any other form."

On June 29, 1995, the Hospital executed Plan Amendment Two ("Amendment Two"). Among other things, Amendment Two provided the following new interest rate and time for determining the interest rate for calculating lump sum benefits:

> [T]he interest rate assumption shall be the annual rate of interest on 30–year Treasury securities for the second calendar month immediately preceding the first day of the Plan Year during which the Annuity Starting Date occurs.

For the period after December 31, 1988, the "Plan Year" consisted of a calendar year. Amendment Two also provided a lump sum option for all participants upon termination of the Plan.

On October 31, 1995, the Hospital issued to Plan participants a notice of intent to terminate the Plan. The notice stated that the Plan administrator expected to terminate the Plan in a standard termination effective December 31, 1995. On January 25, 1996, the Hospital executed Plan Amendment Three ("Amendment Three"). Amendment Three amended the definition of "Annuity Starting Date" as follows:

> For purposes of lump sum payment offered in connection with the termination of the Plan … the Annuity Starting Date shall be the plan termination date for purposes of determining the lump sum amount.

As will be discussed in more detail below, the Hospital submitted Amendments Two and Three to the Internal Revenue Service ("IRS") for approval. On March 11, 1996 and September 25, 1996, the IRS issued rulings approving these amendments.

On April 11, 1996, the Hospital forwarded to PBGC a notice of its intent to terminate the Plan in a standard termination, effective December 31, 1995. That same day, the Hospital mailed election forms to participants so that they could choose an annuity or a lump sum upon Plan termination. Approximately 800 participants received distributions in the form of lump sums in November 1996. In calculating the lump sum distributions, the Hospital used an interest rate of 8.08%.

On March 6, 1998, PBGC notified the Hospital that it had selected the Plan for audit. Eventually, the audit process culminated with PBGC issuing a final determination on December 3, 1999 that the Hospital's valuation of lump sum benefits did not comply with section 417(e)(3) of the IRC [2] and that, rather than using an interest rate of 8.08%, the Hospital should have used an interest rate of 6.26%. In order to bring the Plan into compliance, PBGC re-

---

**1.** For lump sum benefits, section 417(f)(2)(A)(ii) provides that "annuity starting date" means "the first day on which all events have occurred which entitle the participant to such benefit." 26 U.S.C. § 417(f)(2)(A)(ii).

**2.** Section 417(e)(3)(A)(ii) provides that the "applicable interest rate" for calculating lump sum benefits is the "annual rate of interest on 30–year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations provide." 26 U.S.C. § 417(e)(3)(A)(ii).

quested, among other things, that the Hospital recalculate the benefits using an interest rate of 6.26% and pay the additional benefits to participants with interest from the date of the original distribution to the date of the additional payment. To date, the Hospital has not taken the requested action.

On March 9, 2001, PBGC filed this suit to enforce a final agency determination that violations of Title IV have occurred. In its Complaint, PBGC requested that this Court enter judgment in favor of PBGC enforcing its final determination and requiring the Hospital to comply with Title IV of ERISA. PBGC also to seeks to recover from the Hospital all costs and expenses, including attorney's fees, incurred in connection with this action. PBGC has filed an administrative record consisting of five volumes for the Court's consideration. The parties have filed cross-motions for summary judgment and this case has been submitted for determination.[3]

### THE PARTIES' CONTENTIONS

In its motion, PBGC seeks judgment as a matter of law pursuant to Rule 56 of the Federal Rules of Civil Procedure[4] arguing that the Hospital was required to use an interest rate of 6.26% in calculating the lump sum benefits at issue. Specifically, PBGC argues that pursuant to section 417(f)(2)(A)(ii) of the Internal Revenue Code and applicable Treasury regulations, the "annuity starting date"[5] was November 1996 because lump sum distributions were made in that month. PBGC

points out that under Amendment Two, the time for determining the interest rate was the "second calendar month immediately preceding the first day of the Plan Year during which the Annuity Starting Date occurs." Because the Plan Year was a calendar year, PBGC contends that the first day of the Plan Year during which the annuity starting date occurred was January 1, 1996. Thus, PBGC's argument continues, the second calendar month preceding January 1, 1996 was November 1995 and the 30–year Treasury securities rate in effect in November of 1995 was 6.26%.

In its motion, the Hospital argues that it is entitled to judgment as a matter of law because it was required under the Plan to use an interest rate of 8.08% to calculate the lump sum benefits distributed in November of 1996. The Hospital asserts that under Amendment Three, the annuity starting date was December 31, 1995, the date the Plan was terminated. The Hospital argues, therefore, that the first day of the Plan year during which the annuity starting date occurred was January 1, 1995 and that the second calendar month preceding January 1, 1995 was November 1994. According to the Hospital, the 30 year Treasury securities rate in effect in November of 1994 was 8.08% and, thus, this interest rate was correctly used to calculate the lump benefits owing to participants at plan termination.

In response to PBGC's contentions, the Hospital argues, among other things, that the IRS, not PBGC, has the responsibility for interpreting provisions of the IRC at

---

3. At oral argument on the motions, the parties stipulated that there are no genuine issues of material fact and that this case is ripe for judgment as a matter of law.

4. Summary judgment shall be rendered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.

5. The meaning of these terms will be discussed in more detail below.

issue here. The Hospital also contends that the IRS did, in fact, approve the Plan Amendments at issue and that the PBGC should not be permitted to overturn the IRS's approval.

### ANALYSIS

*Is PBGC Precluded from Interpreting the IRC?*

■ At the outset, the Court must deal with the Hospital's contention that since the agency with the preeminent responsibility of interpreting the IRC, the IRS, had previously approved Amendments Two and Three and, therefore, the Hospital's calculation of lump sum benefits, PBGC cannot now require them to revalue such benefits. The Court must also resolve a related contention of the Hospital; that PBGC is without authority to interpret provisions of the IRC.

The Hospital fails to recognize that the favorable IRS rulings, by their express terms, do not purport to conclude that the plan amendments comply with Title IV of ERISA. The IRS letter dated March 11, 1996 states that "[t]his letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other federal or local statutes." While sections 417(e) and 417(f), the key provisions at issue here, are contained in the IRC, the letter makes no reference to the operation of these provisions and their effect on the calculation of lump sum benefits. The September 25, 1996 letter states that "[w]e have considered the information you sent us and have determined that your termination of this plan does not *adversely affect its qualification for federal tax purposes. Please note that this is not a determination regarding the effect of other federal or local statutes.*" (emphasis added). This letter states clearly that the IRS is only determining the plan's qualification for tax purposes and nothing else. Furthermore, with the September 25 letter, the IRS included Publication 794 which states that "[a] favorable determination letter is limited in scope and may also have a limited useful life. A determination letter generally applies to *qualification requirements* regarding the form of the plan." (emphasis added). In addition, nowhere in Publication 794 does it reference compliance with section 417(e) or the calculation of lump sum benefits due to participants as being the purpose of the determination letter. Indeed, this publication provides:

> Employee retirement plans that fail to satisfy the requirements under Code section 401(a) are not entitled to favorable tax treatment. Therefore, many employers desire advance assurance that the terms of their plans satisfy qualification requirements. The Internal Revenue Service provides such advance assurance by means of the determination letter program. A favorable determination letter indicates that, in the opinion of the Service, the terms of the plan conform to the requirements Internal Revenue Code section 401(a).[6]

IRS Publication 794.

■ Put simply, a favorable IRS letter is not conclusive of compliance with Title

---

**6.** The Court recognizes that it could be argued that section 417(e) is incorporated into the employee plan qualification requirements of section 401(a). *See* 26 U.S.C. § 417(a)(11). Nonetheless, while the Hospital did disclose to the IRS the interest rate it intended to use the calculate the distributions, the record does not reflect that the Hospital sought a ruling on section 417 or that it disclosed all relevant information such as the date of distribution or the date upon which participants and spouses returned their consent forms. Again, nothing in the administrative record shows that the determination letters dealt

IV of ERISA. *Flo–Con Systems, Inc. v. Pension Benefit Guaranty Corp.*, 39 F.Supp.2d 995, 1001 (C.D.Ill.1998) ("a letter of tax qualification is not determinative of the validity of a termination"); *see Esden*, 229 F.3d at 176–77 (IRS letter "indicates only that an employee retirement plan qualifies for favorable tax treatment by meeting the formal requirements of I.R.C. § 401(a)" and is not conclusive of compliance with Title I of ERISA); *Hickey v. Chicago Truck Drivers Union*, 980 F.2d 465, 469 (7th Cir.1992) (same). Thus, the Hospital may not rely on such a letter to prevent PBGC from interpreting and enforcing provisions of Title IV of ERISA as they relate to termination of an employee retirement plan.

Turning to the Hospital's contention that PBGC is without authority to interpret provisions of the IRC, the Court notes that section 1303(a) of Title IV of ERISA provides that PBGC "shall annually audit a statistically significant number of plans terminating under section 1341(b) of this title to determine whether participants and beneficiaries have received their benefit commitments...." 29 U.S.C. § 1303(a). Section 1341(b) provides guidelines for the termination of a single-employer plan. 29 U.S.C. § 1341(b). More specifically, section 1341(b)(3)(A) states that in distributing assets pursuant to a standard termination, the plan administrator must comply with the provisions of the plan *and any applicable regulations*. 29 U.S.C. 1341(b)(3)(A). (emphasis added). Further, Section 1341(b)(4) states that "[n]othing in this section shall be construed to preclude

the continued exercise by the corporation [PBGC], after the termination date of a plan terminated in a standard termination under this subsection, of its authority under section 1303 of this title with respect to matters relating to the termination." 29 U.S.C. § 1341(b)(4).

■ Thus, Title IV provides for PBGC audits of terminating plans to determine whether participants have received their benefit commitments. It would seem beyond dispute that the interpretation of section 417(e) and 417(f) concerns whether "participants and beneficiaries have received their benefit commitments." 29 U.S.C. § 1303(a). *See Flo–Con Systems, Inc.*, 39 F.Supp.2d at 1001 (recognizing PBGC's authority to interpret and enforce section 417(e) and to require employer to revalue benefits); *Piggly Wiggly Southern, Inc. v. Pension Benefit Guaranty Corp.*, 19 Employee Benefit Cas. 1163, 1168 (N.D.Ind.1995) (same).[7] Yet, the Hospital argues that the phrase "any applicable regulations" contained in section 1341(b)(3)(A) does not include the IRC because only the IRS, not the PBGC, has the authority to interpret the IRC. The Hospital contends that a previous version of section 1341(b)(3)(A) only required that a plan administrator comply with applicable regulations of the PBGC, rather than *any* applicable regulations, and that the amendment deleting the reference to the PBGC was a "technical amendment" which does not evidence Congress' intent to expand the scope of "applicable regulations." The Court disagrees.

with section 417 or the proper calculation of lump sum benefits. *See Esden v. Bank of Boston*, 229 F.3d 154, 176 (2d Cir.2000) ("there is no indication that, in issuing the determination letters approving the Plan, the IRS key district director considered the specific issue we must decide"); *Lyons v. Georgia–Pacific Corp. Salaried Employees Retire-*

*ment Plan*, 221 F.3d 1235, 1252 (11th Cir. 2000) (same); *In re Gulf Pension Litigation*, 764 F.Supp. 1149, 1172 (S.D.Tex.1991), *aff'd sub nom., Borst v. Chevron Corp.*, 36 F.3d 1308 (5th Cir.1994) (same).

7. Both Flo–Con and Piggly Wiggly dealt with a previous version of section 417.

The Hospital acknowledges, in effect, that the legislative history of the amendment fails to indicate that Congress intended that the "regulations" remain confined solely to those of the PBGC nor does it otherwise show why the plain reading of the provision should not control. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' "). Reading the provision in such a manner to include IRC provisions that concern the calculation of benefits due to participants would seem necessary if PBGC is to carry out its required function of auditing terminating plans to determine whether participants have received their benefit commitments. Accordingly, the Court concludes that PBGC had the authority to determine whether the Hospital correctly interpreted sections 417(e) and 417(f) of the IRC for purposes of calculating lump sum benefits due plan participants.[8]

*Standard of Review*

Having concluded that PBGC was within its authority to interpret sections 417(e) and 417(f) of the IRC as part of its enforcement mandate under Title IV of ERISA, the Court also concludes that PBGC's views on the issues in this case are entitled to deference. *Piggly Wiggly Southern, Inc.*, 19 Employee Benefit Cas. at 1168 ("great deference is afforded to the interpretations and regulations of the PBGC which is responsible for the interpretation and enforcement of ERISA"); *see Trustees of Iron Workers Local 473 Pension Trust v. Allied Prods. Corp.*, 872 F.2d 208, 210 n. 2 (7th Cir.1989) ("PBGC's views are entitled to deference because of its responsibility to enforce Title IV of ERISA."). Furthermore, the Court

> must [only] determine whether the agency's determination is reasonable. In making this determination, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding ... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

*Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1168 (11th Cir.1988) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 11, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).[9]

---

**8.** The Hospital also contends that PBGC's interpretation of section 417(e) is based on a void C.F.R. regulation and a C.F.R. regulation that was not in effect when the Plan was terminated. Even if that were true, the Court fails to see why the statutory authority set forth in 29 U.S.C. §§ 1303(a), 1341(b)(3)(A), and 1341(b)(4) is insufficient to permit the PBGC to determine whether the Plan fulfilled its benefit commitments.

**9.** The Hospital argues that the administrative record before the Court is deficient in part because it contains "no PBGC legal analysis, no request from the PBGC's general counsel's office (not even a privilege log), and no re-

quest for evidence from the IRS." First, although the Court is unclear as to the content of the "legal analysis" the Hospital is seeking, the Court finds that the record contains at least some PBGC legal analysis. A.R. 1165–96, 1186, 1219. Further, the Hospital fails to cite authority requiring materials such as a "request to the PBGC's general counsel's office" to be included in an administrative record. The Hospital also contends that the administrative record is deficient because PBGC did not indicate that the Hospital had incorrectly computed the annuity starting date during the audit process. The Court concludes that PBGC did indicate that it believed that

*Was PBGC's Interest Rate Determination Reasonable?*

■ The Court now turns to whether PBGC acted reasonably in determining that the Hospital used an incorrect interest rate in calculating the lump sum benefits due plan participants. The interest rate to be used is the rate on 30–year Treasury securities. The question is whether the interest in effect in November 1995, as PBGC contends, or the rate in effect in November 1994, as the Hospital contends, should have been used.

The parties agree that under Amendment Two of the Plan, the time for determining the interest rate is the "second calendar month immediately preceding the first day of the Plan Year during which the Annuity Starting Date occurs." The parties' contentions turn on when the annuity starting date occurred. For purposes of valuing a lump sum payment, the term "Annuity Starting Date" is defined as "the first day on which all events have occurred which entitle the participant to such benefit." 26 U.S.C. § 417(f)(2)(A)(ii). PBGC argues that the Department of the Treasury has issued regulations further defining "annuity starting date" as "the first day of the first period for which an annuity is paid as an annuity or any other form." Treas. Reg. § 1.401(a)–20 Q & A–10(b)(1) (1988). Thus, according to PBGC, the annuity starting date for lump sum purposes is the date the lump sum was distributed. PBGC contends that in this case, the month containing the distribution date is November of 1996 because lump sum distributions occurred in that month.

In response, the Hospital argues that pursuant to Plan Amendment Three, the annuity starting date was specified as December 31, 1995, the Plan termination

the annuity starting date was the distribution date rather than the plan termination date.

date. The Hospital points out that Treasury regulations provide that the "annuity starting date is the first date for which an amount is paid, not the actual date of payment." Treas. Reg. § 1.401(a)–20 Q & A–10(b)(2) (1988). Thus, the Hospital argues that the date the lump sum distribution was made, November 1996, was not the annuity starting date because the regulations do not require that the annuity starting date be the date the benefit was actually paid, but rather the date the benefit was payable. The Hospital contends that under section 417(f)(2)(A)(ii), the Plan termination date was the annuity starting date because this was the date on which all events have occurred which entitle a participant to the Plan's lump sum benefit. In other words, the Hospital asserts that after December 31, 1995, an employee could not earn additional benefits.

Treasury Regulation § 1.401(a)–20 Q & A–10(b)(2), however, deals with annuity payments in the sense of a sum payable at regular intervals. The regulations provide the following example concerning such payments:

> [I]f participant A is to receive annuity payments as of the first day of the first month after retirement but does not receive any payments until three months later, the annuity starting date is the first day of the first month.

*Id.* Thus, because such an annuity is paid at regular intervals and, therefore, there would be multiple distribution dates, it would make sense to consider the annuity starting date the first day the annuity is payable. Such a rationale does not necessarily follow when one is considering a one time lump sum distribution.

Calculating present value of lump sum benefits requires using the "applicable in-

A.R. 1186.

terest rate." This term is defined as "the interest rate on 30–year Treasury securities for the month before the *date of distribution* or such other time as the Secretary [of the Treasury] may by regulations prescribe." 26 U.S.C. § 417(e)(3)(A)(ii)(II) (emphasis added). Treasury Regulation § 1.401(a)–20 Q & A–10(b)(1) sets forth the general rule and provides that the annuity starting date is the "first day of the first period for which an amount is paid as an annuity or any other form." In the context of a lump sum payment, the "first day of the first period for which an amount is paid" would be the first day of the month in which the lump sum payment was made. *See* Temp. Treas. Reg. § 1.417(e)–1T(d)(4)(i)–(iii) (1995) (the applicable interest rate for valuing a lump sum payment is that for the "applicable lookback month;" the "applicable lookback month" is the "lookback month" that "contains the annuity starting date"). Further, the preamble to regulations concerning the annuity starting date provide that "the annuity starting date is the distribution date under sections 411(a)(11) and 417(e) for purposes of determining the applicable PBGC interest rate." Sections 411(a)(11) and 417(e) concern the present value calculation of lump sum benefits.

The Court also notes that certain distributions, such as those at issue here, may not take place without written consent of the participant and the participant's spouse. 26 U.S.C. § 417(e)(1)-(2). Such consent must be obtained not more than 90 days before the annuity starting date. Treas. Reg. § 1.417(e)–1(b)(3)–(1988). If, as the Hospital claims, the annuity starting date was December 31, 1995, the consent forms would have had to have been sent out in late 1995. Here, it is undisputed that the Hospital did not even begin mailing consent forms to the participants until April 11, 1996. The fact that consent forms were not sent out until April of 1996 lends further support to PBGC's contention that the annuity starting date could not have occurred in December of 1995.

Applying appropriate deference to PBGC's views, the Court concludes that PBGC's determination of the annuity starting date was, at least, a reasonable construction of the statutes and regulations at issue. The Court also concludes, therefore, that PBGC acted reasonably in determining that the Hospital used an incorrect interest rate in calculating the November 1996 lump sum distributions.

### CONCLUSION

There are no genuine issues of material fact and PBGC is entitled to judgment as a matter of law. Accordingly, PBGC's Motion for Summary Judgment (Docket No. 25) is **GRANTED** and the Hospital's Motion for Summary Judgment (Docket No. 26) is **DENIED.** Counsel for PBGC shall file a brief in support of their request for attorney's fees and costs together with supporting time and expense records within ten (10) days from the date hereof. The Hospital shall then have ten (10) days from the date of PBGC's brief to file a responsive brief.