Betty Ann BIRD, Plaintiff,

v.

EASTMAN KODAK COMPANY, Metropolitan Life Insurance Company, and Kodak Retirement Income Plan, Defendants.

No. 8:03CV2318–T–26MSS.

United States District Court,
M.D. Florida,
Tampa Division.

April 4, 2005.

John Jay Waskom, Sarasota, FL, for Plaintiff.

**1118**

Ralph C. Losey, Alan Harrison Brents, Orlando, FL, Frank E. Brown, Tampa, FL, Karen M. Wahle, Shad Fagerland, Washington, DC, for Defendants.

## ORDER

LAZZARA, District Judge.

This cause comes before the Court on the parties' cross motions for summary judgment (dkts. 58 & 62), supporting memoranda and exhibits (dkts. 59 & 63), and opposition memoranda (dkts. 73 & 76).

Summary judgment is appropriate where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). On a motion for summary judgment, the court must review the record, and all its inferences, in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Having carefully considered all of the parties' submissions, the Court finds that final summary judgment should be granted in favor of Defendants and against Plaintiff.

## FACTS [1] & ALLEGATIONS

Plaintiff Betty Ann Bird seeks to obtain retirement benefits from Defendants Eastman Kodak Company ("Kodak") and Kodak Retirement Income Plan ("KRIP" or "The Plan"), an employee pension benefit plan and its sponsor. Plaintiff brings this action under § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), which authorizes a cause of action "to re-cover benefits due to him under the terms of his plan."

Plaintiff was never an employee of Kodak nor a participant in the Plan, as that term is defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Rather, Plaintiff alleges that she is entitled to Plan benefits solely as a "beneficiary" of her late husband, John Bird, to whom she was married from July 1997 through his death in September, 2002. John Bird was a Kodak employee from 1943 until his retirement in 1979. During his employment, he was a participant in the Plan, a "defined benefit" pension plan as defined by ERISA, 29 U.S.C. § 1002(35). Upon his 1979 retirement, he became eligible to receive monthly Plan benefits which would continue throughout his life. At the time of his 1979 retirement, John Bird was married to his first wife, Jean Bird. Under the terms of the Plan then in effect, as a married participant, the "normal form of payment" of his benefits was a "Contingent Annuitant annuity" of 50 percent, with his spouse Jean as the "contingent annuitant." (KRIP (Dec. 31, 1978), vol. II, tab 1 ("1978 Plan Doc."), § 11.1(b) [EK00030].[2]) Thus, he would receive a monthly annuity equal to a fixed amount during his lifetime and, if his contingent annuitant (spouse Jean) was alive at the time of his death, she would then receive monthly payments equal to 50 percent of the amount formerly payable to him for her lifetime. However, "[i]f the spouse is not alive when the Participant dies, no further payments are made." (KRIP (Mar. 31, 1997), vol. II, tab 3 ("1997 Plan Doc."), § 7.04(b) [EK00116].)

The Plan also allowed John Bird to elect to receive his benefits in one of several "optional forms of payment" instead of the 50% Contingent Annuitant annuity. By

---

1. After careful review of the record, the Court adopts and incorporates herein portions of Defendants' Statement of Undisputed Facts.

2. Defendants' exhibits are identified throughout the Court's Order by the initials "EK."

law, these optional forms of payment must have the same actuarial value as his "normal form of payment," so that the cost to the Plan of providing the benefit is actuarially equivalent, regardless of what form is elected. (1978 Plan Doc. § 11.9 [EK00034]; 1997 Plan Doc. § 5.06(a) [EK00102] (discussing actuarial equivalence requirement of optional forms of payment). *See also Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan,* 221 F.3d 1235, 1243 (11th Cir.2000) (discussing IRC § 411(a)(11) as mandating actuarial equivalence across optional forms of payment made available to a participant).) At the time of his 1979 retirement, John Bird chose the 100% Contingent Annuitant annuity optional form of benefit. Under this option, he would receive a monthly annuity of a fixed amount during his lifetime and, if his spouse Jean was still alive at the time of his death, she would receive an equal monthly amount over her lifetime.

The exact amount payable to John Bird (and, if she survived him, to Jean Bird) was determined at the time of his 1979 retirement by actuaries to be $567.58, which took into consideration Jean's age and expected mortality based on mortality tables referenced by the Plan. (*See* 1978 Plan Doc. § 2.6 [EK00007]; 1997 Plan Doc. § 2.04(b) [EK00062]. *See also* Benefits Application (1979), tab. 5 to Denial Letter of March 26, 2003 ("Denial Letter"), vol. I, tab B [EK00566–69].) Subsequent Plan amendments, providing for cost-of-living increases, raised this amount to $765.18 by 1997. John Bird received Plan benefits from his 1979 retirement until his death in September 2002. His wife, Jean Bird, predeceased him in 1993. Therefore, when John Bird died in September 2002, because "the spouse [was] not alive when the Participant die[d], no further payments [were] made" under the Plan. (1997 Plan Doc. § 7.04(b) [EK

00116].) It is this determination that is challenged by Plaintiff in this action.

After his wife Jean's death in December 1993, John Bird's family became concerned about his physical and mental health. In 1996, his family members visited his home in Sarasota and found him living in what they termed "deplorable conditions" with his financial affairs in disarray. John Bird ultimately moved into an assisted living facility called Sunnyside Village ("Sunnyside"). (Petition for Appointment of Plenary Guardian (July 26, 1997) ("Petition"), tab 6 to Denial Letter [EK00579].) Sunnyside personnel reported to family members in early July, 1997, that John Bird's health appeared to be deteriorating and that he needed additional assistance. Days after this information was reported, on July 11, 1997, John Bird, then 80, married plaintiff Betty Ann Cole, a 54–year–old Sunnyside employee. They had courted for approximately three weeks. (*Id.*)

Immediately after their marriage, the Birds visited John Bird's accountant and broker to change title on his assets, including his investment portfolio, to joint ownership. (*Id.*) On or about July 21, 1997, John Bird sent a fax to Defendant Metropolitan Life Insurance Company ("MetLife"), which at that time performed various administrative, payment, and insurance services for several Kodak plans, indicating an interest in adding "wife Betty Ann Bird to be beneficiary on all my accounts." (July 21, 1997 correspondence, tab 1 to Denial Letter [EK00547].) This fax was then forwarded to Kodak's Benefits Operations Department ("the Department"), and Kodak employee Bob Barnickel responded by fax on July 30, 1997, asking for Plaintiff's social security number and date of birth, so that the "beneficiary change" could be effected. (July 30, 1997 correspondence, tab 1 to Denial Letter [EK00546].) This information was

completed by the Birds in writing and returned to Kodak on the same day. (*Id.*)

The Department then mailed to the Birds an Insurance Enrollment and Beneficiary Designation Form ("the Form"), which (when completed, signed, and returned) allowed John Bird to add his wife as beneficiary to all employee benefit plans in which a beneficiary could be designated. With respect to John Bird, this included only his life insurance plan.[3] (Designation Form, tab 32 to Denial Letter [EK00708].) The Form expressly stated the Plans to which it applied and it made no mention whatsoever of the KRIP Plan. John Bird completed the Form and returned it on August 8, 1997. The Department processed it on August 11th and returned a copy to John Bird confirming the change. (*Id.*)

Defendants maintain that because the Plan document does not refer to "beneficiary," but rather uses the term "contingent annuitant" throughout, the July 21st correspondence from John Bird was not interpreted by the Department to request a change to his "contingent annuitant" under the Plan. As a result, the Department did not prepare and send John Bird the forms and information necessary for him to add Plaintiff as a "contingent annuitant" to the Plan. Rather, John Bird only received information that allowed him to change—as clearly noted in the form sent to him—his life insurance benefits.

The Plan in effect in 1997 did allow a participant in retiree status (as was John Bird) to change his contingent annuitant under certain circumstances, or to add a new contingent annuitant if his prior designated contingent annuitant predeceased him. The requirements for such changes

as of 1997 are provided in Plan § 7.03(g)(3):

**Participant's Right to Revoke the Form of Payment After the Annuity/Benefit Starting Date.**

On or after the Annuity/Benefit Starting Date, a Participant may ... change the designation of his Contingent Annuitant.... For any of the above-described elections to take effect, the Participant and his Contingent Annuitant must be alive on the effective date of the election, which is the first day of the second month following the month in which KRIPCO receives satisfactory evidence of the good health of the Participant and/or the Contingent Annuitant, whichever is appropriate.

(1997 Plan Doc. § 7.03(g)(3) [EK00230].)

The Summary Plan Description ("SPD") similarly states:

**Changes in forms of payment**: You may change your form of payment **before** you begin receiving benefit payments by contacting Benefits information. Any changes you wish to make **after** you begin receiving benefit payments will depend upon your being able to provide satisfactory evidence of your good health (or that of your spouse, or any other person you designated as the survivor), depending upon the nature of the change.

(1995 SPD, vol. II, tab 4, at 122 [EK00488] (emphasis in original).) Moreover, when a change to a contingent annuitant election is made, the amount of the future benefit entitlement is recalculated to determine the actuarially equivalent benefit, in light of the expected lifespan of the new contingent annuitant. It is undis-

---

**3.** As noted on the Form, it could also have been used to change John Bird's beneficiary in the Kodak Employee Stock Ownership Plan or the Kodak Employee Savings and Investment Plan. However, John Bird did not participate in these plans. (*See* Designation Form, tab 32 to Denial Letter [EK00708].)

puted that John Bird did not provide proof of good health at any time.

During the time frame that John Bird was effecting the changes to the title on his assets and the beneficiary designations, his seven surviving siblings grew concerned that his assets would become unavailable for his continued support and maintenance. Seeking to protect John through the judicial system, they filed a Petition for Determination of Incapacity and Petition for Appointment of Emergency Temporary Guardian with the Circuit Court of Sarasota County Florida on July 26, 1997, approximately two weeks after John's marriage to Plaintiff. (*Id.* [EK00573–79].) After the appointment of an examining committee to investigate John's mental capacity on August 1, 1997 (tab 11 to Denial Letter [EK00610–611]), the court entered an order freezing his assets as of October 20, 1997, "including any and all interest which John E. Bird may have in a pension benefit plan with his former employer, Eastman Kodak." (Order Freezing Assets (Oct. 20, 1997), tab 16 to Denial Letter [EK00643].) On January 26, 1998, following review of the examining committee's reports, the court entered an Order Determining Total Incapacity based on "[c]ognitive disorder secondary to neurological insult," and appointed a plenary guardian. (Order Determining Total Incapacity (Jan. 26, 1998), tab 17 to Denial Letter [EK00644–645].)[4]

On or about the same date, an employee in the Department sent John Bird a handwritten communication, in response to an inquiry made by one of the Birds, stating "Mr. Bird you also have a survivor benefit for your wife Betty. It's $765.18 paid to her monthly if you predecease her. This is a life benefit for your wife." (Tab 31 to Denial Letter [EK00706].) This information was incorrect. It is accurate that John Bird retired with a 100% joint and survivor annuity, but his first wife Jean was listed as "contingent annuitant" for the Plan. It is also accurate that this annuity paid $765.18 monthly, and would have continued to be paid to Jean after John's death had she not predeceased him. Therefore, although John would continue to receive his monthly benefit throughout his life, because his contingent annuitant did not survive him, "no further payments [would be] made" after his death. (1997 Plan Doc. § 7.04(b) [EK00116].) Finally, in response to an inquiry from the court-appointed guardian on March 24, 1998 (tab 18 to Denial Letter [EK00661]), Kodak provided a "Benefits Affidavit" to the guardian dated April 16, 1998. (Tab 1 to Denial Letter [EK00550–551].) This affidavit stated that John Bird had commenced his Plan benefit on February 1, 1979, in the form of a 100% Joint & Survivor Annuity Option, and was receiving a current benefit of $765.18. It did not name the contingent annuitant for this plan, or indicate that the designated contingent annuitant, Jean Bird, had died in 1993. It did not state that Plaintiff was the contingent annuitant or that she was entitled to a Plan benefit. This document was not prepared for the Birds or provided to the Birds.

Following John Bird's death in September 2002, Plaintiff applied to receive $765.18 per month as the "surviving beneficiary" of John Bird, basing her entitlement, in part, on the handwritten note from the Department, dated January 26, 1998 and stating that Betty Ann had a

---

4. It appears that his declaration of incapacity remained in place until John Bird's death in 2002. Although a later stipulation was entered into in December 1998 allowing John to consent to medical treatment, and to exercise his right to travel (*see* Stipulation (Dec. 30, 1998), tab 21 to Denial Letter [EK00673–674]), a court-appointed guardian remained in charge of his financial affairs until his death, including his pension.

survivor benefit from the Plan, and the Benefits Affidavit dated April 16, 1998. (Tab 3 to Denial Letter [EK00556–563].) Plaintiff's claim was denied on February 7, 2003, on the ground that John Bird had not taken the required steps to establish a survivor benefit for her, i.e., to change his "Contingent Annuitant," as described in the Plan document and SPD. (Tab 2 to Denial Letter [EK00552–555].) These steps would have included providing proof of good health to the plan administrator before the change could become effective. The denial letter also noted that, had such proof of good health been provided and had the contingent annuitant been changed to Plaintiff in 1997, an immediate reduction in John Bird's monthly benefit would have been made of approximately 50%, effective as of the time of the change, with the exact reduction depending on the date that the new designation became effective. (*Id.* at 2 [EK00553.]) This is because, under the Plan's terms as well as ERISA and IRS rules, optional forms of payment must be actuarially equivalent. More specifically, because the Plan would (if such a change had been made) be paying a lifetime benefit to a much younger Betty Ann—who was 24 years younger than Jean and thus could be expected to receive a benefit over a longer lifetime—the benefit amount would have been immediately reduced to maintain actuarial equivalence. Plaintiff appealed the denial to the plan administrator by letter dated February 20, 2003. (Appeal Request (Feb. 20, 2003), tab 1 to Denial Letter [EK00544–551].)

The KRIP Plan contains a detailed appeal procedure, as is required by ERISA, 29 U.S.C. § 1133, and names the Kodak Retirement Income Plan Committee ("KRIPCO") as the "named fiduciary and plan administrator as those terms are used in ERISA." (KRIP (July 1, 2002) ("2002 Plan Doc."), vol. II, tab 5, § 13.02 [EK00266].) KRIPCO is delegated the power, the duty, and the complete and exclusive discretion ... to construe, interpret, and administer the terms of the Plan, to remedy any possible ambiguities in the terms of the Plan, and to determine conclusively, for all parties, all questions arising out of the interpretation or the administration of the Plan. (2002 Plan Doc. § 13.03(b) [EK00267].) This includes authority to decide disputed claims for benefits. (*Id.* at § 13.03(c)) (the Committee has authority "to determine conclusively the right of any person to benefits under the Plan and the amount of such benefits, including, but not limited to, the determination of all questions relating to eligibility for participation and benefits"). The Plan further provides that KRIPCO may delegate its responsibilities to designated persons or committees. (*Id.* at § 13.07 [EK00270].) On July 13, 2001, KRIPCO delegated its authority to review and decide appeals of denied claims to Rita D. Metras, Director of Worldwide Benefits. (Delegation, vol. II, tab 6 [EK01296].)

Ms. Metras reviewed and decided Plaintiff's appeal following receipt of Plaintiff's February 20, 2003 letter. In considering Plaintiff's appeal, Ms. Metras reviewed the governing plan documents and SPDs in effect at the time of John Bird's 1979 retirement as well as in 1997–98, the materials submitted by Plaintiff, the initial determination of the claim, publicly available documents from the guardianship proceeding, John Bird's employment records, and medical records that were available to the plan administrator. (Denial Letter at 13 [EK00543].) She compiled a list of all documents that she relied upon in reaching her decision, and attached it to her March 26, 2003 response. (*Id.*) She also compiled and attached a list of the many documents that she considered but that she did not rely upon. (Tab 30 to Denial Letter [EK00702–705].) Copies of all documents considered—whether relied upon or not—were provided to Plaintiff with Ms. Metras'

response. After consideration of these documents, Ms. Metras determined that Plaintiff could not be considered a "contingent annuitant" under the Plan's terms and thus was not eligible to receive a benefit as John Bird's surviving spouse. Ms. Metras reviewed and interpreted § 7.03(g)(3) of the Plan document in effect in July 1997, as well as the SPD in effect at that time, as clearly stating the requirement that proof of good health must be submitted by either the participant or the survivor, "whichever is appropriate." [5] (*See* 1997 Plan Doc. § 7.03(g)(3) [EK00115]; 1995 SPD at 122 [EK00488] (change of contingent annuitant "will depend upon" providing satisfactory proof of good health).) Ms. Metras found that this language was unambiguous. She also determined from Plan records that John Bird had been sent an SPD in 1995 that contained this requirement and thus, could not be said to have been unaware of it. (Denial Letter at 9 [EK00539].) Ms. Metras recognized that the handwritten information provided to John Bird on January 26, 1998 by the Department was incorrect, in that Jean—not Betty Ann—was the only contingent annuitant ever established by John Bird. (Denial Letter at 4 [EK00534].) Nonetheless, because the terms of the Plan and SPD were clear as to the requirements for changing a contingent annuitant, the January 26, 1998, informal communication did not serve to modify the unambiguous terms of the Plan and did not relieve John Bird from complying with the Plan's requirements for adding a contingent an-

nuitant. (*Id. See also id.* at 9 [EK00539].) Similarly, the April 26, 1998, Benefits Affidavit provided to John Bird's guardian, to the extent that it provided incorrect information, also did not serve to amend the terms of the Plan. (*Id.* at 4 & 9 [EK00534, 00539].)

Ms. Metras also denied the claim on an alternative ground. Ms. Metras had asked MetLife, which regularly analyzed submissions of proofs of good health by Plan participants, to retroactively determine whether John Bird could have provided proof of good health at any time between July 21, 1997, and his September 2002 death, had the plan administrator interpreted his request as seeking a change in his contingent annuitant under the Plan. (Tab 24 to Denial Letter [EK00686–688].) All medical records that were available to the plan administrator were sent to MetLife. (*Id.*) Following a review of these records, MetLife's Statement of Health Unit concluded that John Bird could not have passed medical underwriting standards at any time during the period July 21, 1997, through September 6, 2002, under the MetLife Medical Underwriting Guidelines for Life Insurance, which are the guidelines used for proof of good health under the Plan. (Tab 24 to Denial Letter [EK00690].) Therefore, Ms. Metras concluded that: even had John Bird's July, 1997, correspondence been interpreted as a request to change his contingent annuitant under the Plan; even if he had attempted to fulfill the Plan requirements

---

5. Whether the proof of good health must be submitted by the participant or the survivor depends on the type of change requested. This requirement is intended to avoid adverse selection causing harm to the Plan. When the participant desires to add a contingent annuitant, the proof of good health must be submitted by the participant, to prevent a situation where a participant waits until he is near death to name an annuitant. When a participant desires to eliminate a contingent annui-

tant, the proof of good health must be submitted by that contingent annuitant, to prevent a situation where a participant eliminates a contingent annuitant whenever it becomes clear that the contingent annuitant would predecease him. Without the safeguard provided by the proof of good health requirement, retirees could "game" the Plan, which would prove costly to the Plan and deplete its assets. (Explanation of Proof of Good Health Rules, tab 26 to Denial Letter [EK00694].)

by providing proof of good health; even if he had submitted such proof prior to the asset freeze effective October 18, 1997; even if there had been no legal barriers to make this change in light of the subsequent asset freeze and legal finding of incapacity and incompetency; and assuming that the Bird family would not have challenged any such request and that the court would not have later rescinded it as part of the guardianship proceeding, John Bird still would have been unable to provide the necessary proof of good health to effect the change.[6]  As such, Ms. Metras found that Plaintiff was not prejudiced by receipt of any incorrect information in 1998, and payment to her of a survivor benefit under the Plan would not only be contrary to the Plan's terms, but would represent a windfall to which she could not otherwise have been entitled.

Plaintiff filed her Amended Complaint in this action on February 12, 2004 (dkt.13), setting forth three separate claims under ERISA.  In each count, Plaintiff sought pension benefits to which she claimed entitlement as a Plan beneficiary and as the survivor of her late husband.  On March 15, 2004, this Court issued an Order dismissing Counts Two (for breach of fiduciary duty under ERISA § 502(a)(3)) and Three (for equitable relief under ERISA § 502(a)(3)) with prejudice for failure to state a claim.  (Dkt.22.)  The Court allowed only Count One, a claim for benefits under the Plan's terms, to survive.  (See Order of Mar. 15, 2004 at 2 (describing Count One as a claim for "relief under § 1132(a)(1)(B) in her capacity as a beneficiary").)  That remaining claim is the subject of this motion for summary judgment.

### DISCUSSION

Plaintiff seeks entitlement to a "survivor benefit" under the Plan as her late husband's beneficiary, based on two written communications made to John Bird by Bob Barnickel, an employee in the Kodak Benefits Operations Department, in 1998.  She alleges that these communications confirmed her late husband's request by fax (made on July 21, 1997) to add her as his "beneficiary."

■■■  When an ERISA plan vests discretionary authority in its administrator to interpret the plan's terms and adjudicate claims, the Court's role on judicial review is limited to deciding whether the administrator's denial of benefits under the terms of the plan was arbitrary and capricious. See Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir.1997) (adopting arbitrary and capricious standard "when the plan grants the administrator discretion") (citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).  Under the arbitrary and capricious standard of review, the administrator's decision must be upheld if "there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made." Buckley at 941.  This deferential standard applies both to the interpretation of the plan and to its factual determinations. Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449–51 (11th Cir.1997).  The instant Plan document clearly designates KRIPCO as the plan administrator and vests it with the "discretion" to "construe, interpret, and administer the terms of the Plan, to remedy any possible ambiguities" and to "deter-

---

**6.**  Moreover, Ms. Metras also noted that, even prior to the October 18, 1997 Order freezing assets, the record was replete with evidence that John Bird had no greater capacity in July through September, 1997, than he did in October 1997.  For example, the examining committee found during a September 1997, examination that he could not "draw a line to connect dots with extensive instruction." (Deposition of Geoffrey Kanter, Ph.D., tab 25 to Denial Letter [EK00692].)

mine conclusively the right of any person to benefits under the Plan and the amount of such benefits, including . . . determinations of all questions relating to eligibility for participation. . . ." (2002 Plan Doc. § 13.03 [EK00267].) Further, "KRIPCO's decision [on the review of denied claims] will be final and binding upon all parties." (*Id.* § 13.03(f) [EK00268].) This language clearly vests discretionary authority to interpret the terms of the Plan and make final adjudications of Plan claims in KRIPCO and thus, the arbitrary and capricious standard of review is triggered. No possible conflict of interest has been identified here that would suggest that any other standard is applicable. Further, this case does not present a situation of competing beneficiaries and therefore, the doctrine of substantial compliance has no application to the Court's review here.

Because the role of the court under the arbitrary and capricious standard of review is limited to reviewing the reasonableness of the plan administrator's decision "based upon the facts as known to the administrator at the time the decision was made," a court cannot consider other facts or documents not before the plan administrator at the time of its decision. *Jett v. Blue Cross & Blue Shield, Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989). In *HCA Health Services, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982 (11th Cir.2001), the Eleventh Circuit reiterated the procedure to be used in determining whether a plan administrator's decision to deny a benefit claim is arbitrary and capricious. First, the court is to conduct a de novo review to determine whether the plan administrator's interpretation is "wrong" and whether the claimant's rival interpretation is reasonable. *Id.* at 993–94. *See also Brown v. Blue Cross and Blue Shield, Inc.,* 898 F.2d 1556, 1570 (11th Cir.1990) (analyzing whether the claimant has proposed a reasonable interpretation as part of the court's initial de novo review of the

administrator's interpretation). If a de novo review reveals the plan administrator's interpretation to be "correct," the inquiry ends and the plan administrator's benefits determination is upheld. *Adams v. Thiokol Corp.,* 231 F.3d 837, 843 (11th Cir.2000).

If, however, the court finds that the plan administrator's interpretation was "wrong," it must consider whether it is also arbitrary and capricious. In *Jett,* the Eleventh Circuit held that a plan administrator's determination is not arbitrary and capricious if "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time." 890 F.2d at 1139–40. *See also Paramore v. Delta Air Lines,* 129 F.3d 1446, 1451 (11th Cir.1997). A reasonable decision must be upheld "even if there is evidence that would support a contrary decision." *Jett,* 890 F.2d at 1140. The court need only determine "whether [the] interpretation was made rationally and in good faith—not whether it was right." *Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989). *See also Brown,* 898 F.2d at 1564 (for decision to be arbitrary and capricious, the court must find that it is "completely unreasonable").

The Eleventh Circuit has frequently remarked on the great degree of deference inherent in the arbitrary and capricious standard. *See, e.g., HCA,* 240 F.3d at 994 (we "cannot over-emphasize the importance of discretion afforded to a claims administrator" under the arbitrary and capricious standard of review). Thus, a plan administrator's "wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable," and even though evidence "would support a contrary decision." *Id. See also Jett,* 890 F.2d at 1140. The Eleventh Circuit has also discussed the factors that a court may consider in determining

whether a plan administrator's claim determination was reasonable or rational. These factors include "(1) uniformity of construction, (2) fair reading and reasonableness of that reading, ... [and (3)] internal consistency of a plan under the fiduciary's interpretation." *Brown*, 898 F.2d at 1567. *See also Cagle v. Bruner*, 112 F.3d 1510, 1518 (11th Cir.1997) (discussing relevant factors, including good faith).

■ The Court holds that the decision on appeal was not arbitrary and capricious. In making her March 26, 2003, decision denying Plaintiff's claim for Plan benefits as a beneficiary of her late husband, Ms. Metras reviewed, interpreted, and applied the Plan's language governing changes to a participant's contingent annuitant. Because John Bird began receiving benefits in 1979, Ms. Metras found that any change to his contingent annuitant in 1997 would be governed by § 7.03(g)(3) of the Plan, then in effect, which provided the requirements for changes to a participant's contingent annuitant made after his Annuity Starting Date. (Denial Letter at 9 [EK00539]. *See also* 1997 Plan Doc. § 2.06 [EK00064] (defining Annuity Starting Date).) This provision, entitled "Participant's Right to Revoke the Form of Payment After the Annuity/Benefit Starting Date," unambiguously states that for such a change to take effect the Participant and his contingent annuitant must be alive on the effective date of the election, which is the first day of the second month following the month in which KRIPCO receives satisfactory evidence of the good health of the participant and/or the contingent annuitant, whichever is appropriate. (1997 Plan Doc. § 7.03(g)(3) [EK00230].) Based on these terms, Ms. Metras concluded that the provision of satisfactory evidence of good health by John Bird was

a prerequisite to effecting any change to his contingent annuitant designated under the Plan. (Denial Letter at 9 [EK00539] ("he did not satisfy this requirement")). This requirement is also unambiguously stated in the governing SPD, which Mr. Bird received in 1995. (1995 SPD at 122 [EK00488].) Ms. Metras also noted that there was no provision in the Plan that allowed for the Plan's requirements to be overridden by informal or other communications provided to Plan participants that may have been contrary to the Plan's terms. (Denial Letter at 9 [EK00539].) Therefore, even if John Bird or his guardian were given incorrect information in 1998, such information provided no basis for entitling plaintiff to benefits contrary to the Plan's terms. (*Id.*)

ERISA requires that the Plan be administered according to its terms, 29 U.S.C. § 1104(a)(1)(D), and the Plan provides no discretion to the Committee or to Ms. Metras to override its clear terms based on communications made in non-Plan documents. (*See* 2002 Plan Doc. § 13.03 [EK00266–267] (discussing discretion and authority of the Committee).) Although the Plan and SPD terms do not specify the situations where a proof of good health is required from a participant as opposed to a contingent annuitant (depending "upon the nature of the change"), the terms unambiguously require proof of good health from one of the two. To the extent that the provisions are ambiguous as to whom (as between the participant and the contingent annuitant) must provide the proof of good health, the plan administrator is entitled to resolve that ambiguity, and did so based on an analysis of the possible financial impact on the Plan of adverse selection of contingent annuitants. (Denial Letter at 6 [EK00536], referring to tab 24.) There is no ambiguity,[7] however, that a

---

7.  An ambiguous plan provision is one where "reasonable persons could disagree as to [the

provision's] meaning and effect." *Kane v.*

proof of health is required before a contingent annuitant may be added, nor can there be any dispute that no such proof of health was provided. Moreover, the proof of health requirement for changing one's optional form of benefit has existed unchanged in the Plan since it became covered by ERISA when that statute became effective in 1976. (*See* 1978 Plan Doc. § 11.7 [EK00032]; 1979 SPD, vol. II, tab 2, at 12 [EK00415].) As previously mentioned, this requirement serves the important and valid purpose of protecting the Plan from adverse selection by participants on their death bed, or from participants whose contingent annuitants are on their death bed. Without the proof of good health requirement, a participant would be encouraged to receive his benefits in a single life annuity (at a much higher monthly benefit) until his health failed, and only then designate a contingent annuitant. This would result in the Plan's mortality experience differing from that expected by the mortality tables, with a resulting negative financial experience by the Plan.

There is also no evidence of bad faith on the part of the plan administrator in interpreting or applying the Plan provisions. Because all optional forms of payment are actuarially equivalent, as mandated by the Plan and the Internal Revenue Code, the cost to the Plan would be the same regardless of whether plaintiff was added as a contingent annuitant, assuming proof of good health was provided. (*See* 1997 Plan Doc. § 5.06(a) [EK00102], IRC § 411(a)(11) (mandating actuarial equivalence across optional forms of payment made available to a participant).) Plaintiff's claim and appeal were handled pursuant to the Plan's claims and appeals procedures and on a timely basis. The March 26, 2003, denial letter met all requirements of ERISA's regulations and the Plan's own

requirements and described in detail the basis for the denial, including the identification of the Plan provisions on which the decision relied. As KRIPCO correctly asserts, the denial of Plaintiff's claim was based on the unambiguous provisions of the Plan and SPD governing the designation of contingent annuitants. The interpretation of these provisions was based on a common sense reading of all relevant Plan provisions and was consistent with the purpose of the Plan. Therefore, Ms. Metras' decision cannot be found to be arbitrary and capricious, but rather was based on a reasonable and good faith interpretation of unambiguous Plan provisions and must be upheld.

■ With respect to the informal written communications between Mr. Barnickel, a Kodak employee, and Mr. Bird, ERISA expressly provides that "every employee benefit plan shall be established and maintained pursuant to a written instrument." ERISA, 29 U.S.C. § 1102(a)(1). Pursuant to this section, the Eleventh Circuit, in *Nachwalter v. Christie*, 805 F.2d 956 (11th Cir.1986), held that ERISA prohibited oral modifications to ERISA plans. The court explained that:

> A central policy goal of ERISA is to protect the interests of employees and their beneficiaries in employee benefit plans. This goal would be undermined if we permitted oral modifications of ERISA plans because employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements.

*Id.* at 960 (citations omitted). The Eleventh Circuit further expanded the scope of this holding in *Alday v. Container Corp. of America*, 906 F.2d 660 (11th Cir.1990), in

*Aetna Life Ins.*, 893 F.2d 1283, 1285 (11th    Cir.1990).

which the plaintiff argued, as does Plaintiff here, that documents given to him by the plan administrator explaining his retirement benefits could serve to override the terms of the plan. The court held that, under *Nachwalter*, these documents had no effect, notwithstanding that the representations were made in writing and not orally. *Id.* at 665. Since the writings at issue in *Alday* did not satisfy the definition of an SPD or a plan document under ERISA, 29 U.S.C. § 1022, they were no more able to modify the terms of a written plan than could oral representations. Moreover, recognizing the potential adverse impact on plan funding, courts have been particularly reluctant to give effect to informal communications requiring the payment of pension benefits, since funding levels are determined by carefully calibrated actuarial assumptions. *See Armistead v. Vernitron*, 944 F.2d 1287, 1300 (6th Cir. 1991) ("If the effective terms of the plan may be altered by transactions between officers of the plan and individual plan participants ... the rights and legitimate expectations of third parties to retirement income may be prejudiced.").

A narrow exception to this general rule was set out in *Kane v. Aetna Life Ins.*, 893 F.2d 1283 (11th Cir.1990), which held that ERISA's preclusion of informal modifications allows informal communications to apply only to explain ambiguous provisions of the plan. 893 F.2d at 1285. Thus, a court may give effect to informal communications only when the representations made were interpretations, not modifications, of a plan. *Id. See also Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267 (11th Cir.2005). However, "[f]or a representation to be an interpretation of a plan, the relevant provisions of the plan must be ambiguous, that is to say, 'reasonable persons could disagree as to [the provisions'] meaning and effect.'" *Novak v. Irwin Yacht & Marine Corp.*, 986 F.2d

468, 472 (11th Cir.1993) (quoting *Kane*, 893 F.2d at 1285).

Here, Plaintiff does not allege that the Department's representations made to John Bird (or otherwise obtained by him) in 1998 are interpretations of an ambiguous Plan provision. The Plan document and SPD contain a clear and unambiguous requirement that a proof of good health be completed before a participant may designate a new "contingent annuitant." (Plan § 7.03(g)(3)) (Committee must "receive[ ] satisfactory evidence of the good health of the Participant and/or the Contingent Annuitant, whichever is appropriate"); SPD at 122 ("Any changes you wish to make ... will depend upon your being able to provide satisfactory evidence of your good health ..."). Further, the Insurance Enrollment Beneficiary Designation Form that John Bird signed, completed, and returned, designating Plaintiff as a beneficiary, expressly stated that it was applicable to the Life Insurance Plan, the Employee Stock Ownership Plan, and the Employee Savings and Investment Plan. It made no mention whatsoever of the KRIP Plan. The Court finds that "there is no need to refer to other communications between the parties to determine the parties' intent" and thus, the terms of the SPD [and the Plan] are controlling and other documents must be ignored. *Alday*, 906 F.2d at 666.

**ACCORDINGLY**, it is **ORDERED AND ADJUDGED:**

Defendants' Motion for Summary Judgment (dkt.58) is granted. The Clerk shall enter final summary judgment in favor of Defendants and against Plaintiff. Plaintiff's Motion for Summary Judgment (dkt.62) is denied as moot. The Clerk shall also terminate all pending motions and close this case.